**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **CITY OF CLEVELAND,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:08-cv-00139** |
| | ) | |
| **v.** | ) | **Hon. Sara Lioi** |
| | ) | |
| **DEUTSCHE BANK TRUST COMPANY, ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**MEMORANDUM OF LAW OF DEFENDANTS OPTION ONE MORTGAGE
CORPORATION, AMERIQUEST MORTGAGE SECURITIES, INC., COUNTRYWIDE
SECURITIES CORPORATION, HSBC SECURITIES (USA) INC., WASHINGTON
MUTUAL BANK, AND NOVASTAR MORTGAGE, INC.
IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)**

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES ................................................................................. 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................................... 2

ARGUMENT ................................................................................................... 4

I.      THE CITY'S PUBLIC NUISANCE CLAIM IS PREEMPTED BY OHIO LAW ........... 4

II.     THE CITY'S CLAIM IS BARRED BY THE ECONOMIC LOSS DOCTRINE ............ 7

III.    THE CITY'S PUBLIC NUISANCE CLAIM FAILS AS A MATTER OF LAW ........... 9

        A.      As The Complaint Itself Makes Clear, The Defendants Did Not
                Proximately Cause The Alleged Harm ............................................. 11

        B.      The Defendants Did Not Interfere With A "Public Right." .............. 15

        C.      The Defendants' Alleged Conduct Does Not Constitute An "Unreasonable
                Interference." ............................................................................ 17

        D.      Beretta Is Not Persuasive Authority In Light Of Its Abrogation By Statute
                And Non-Analogous Fact Pattern. ................................................. 21

CONCLUSION ............................................................................................... 24

# TABLE OF AUTHORITIES

Page

## Cases

*Allen Freight Lines v. Consolidated Rail Corp.*,
  595 N.E.2d 855 (Ohio 1992)..................................................................................9, 17, 20

*American Financial Services Association v. City of Cleveland*,
  858 N.E.2d 776 (2006) ................................................................................................ 4, 5, 7

*Anza v. Ideal Steel Supply Corp.*,
  547 U.S. 451 (2006) ..........................................................................................11, 12, 13, 14

*Ashtabula River Corp. Group II v. Conrail, Inc.*,
  549 F.Supp. 2d 981 (N.D. Ohio 2008) ................................................................................ 8

*Bell Atlantic Corp. v. Twombly*,
  127 S. Ct. 1955 (2007)....................................................................................................... 10

*Bishop v. Lucent Technologies, Inc.*,
  520 F.3d 516 (6th Cir. 2008)............................................................................................. 10

*BMW v. Gore*,
  517 U.S. 559 (1996) ............................................................................................................. 5

*Brown v. County Commissioners of Scioto County*,
  622 N.E.2d 1153 (Ohio Ct. App. 1993).....................................................................9, 15, 17

*Brown v. First Nationwide Mortg. Corp.*,
  206 Fed. Appx. 436 (6th Cir. 2006) ..................................................................................... 5

*Canyon County v. Syngenta Seeds, Inc.*,
  519 F.3d 969 (9th Cir. 2008).............................................................................................. 14

*Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*,
  511 F.3d 535 (6th Cir. 2007)............................................................................................. 23

*Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*,
  537 N.E.2d 624 (Ohio 1989).............................................................................................. 8

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) ....................................................................8, 9, 10, 13, 16

*City of Cincinnati v. Beretta U.S.A. Corp.*,
  768 N.E.2d 1136 (Ohio 2002).................................................... 1, 10, 11, 21, 22, 23

*City of Gary v. Smith & Wesson*,
  801 N.E.2d 1222 (Ind. 2003) ............................................................................................ 10

*City of Mingo Junction v. Sheline*,
  196 N.E. 897 (Ohio 1935)................................................................................................. 21

*City of Philadelphia v. Beretta U.S.A., Corp.*,
  126 F. Supp. 2d 882 (E.D. Pa. 2000).............................................................................. 6, 10

# TABLE OF AUTHORITIES

**Page**

*City of St. Louis v. Benjamin Moore & Co.*,
226 S.W.3d 110 (Mo. 2007) .................................................................................... 10

*City of Toledo v. Sherwin-Williams Co.*,
No. CI 200606040, 2007 WL 4965044 (Ohio Com. Pl. Dec. 12, 2007) ................................ 22

*City of Warren v. Testa*,
461 N.E.2d 1354 (Ohio Ct. C.P. 1983) .................................................................. 15

*Combs v. International Ins. Co.*,
354 F.3d 568 (6th Cir. 2004) ........................................................................ 16, 23

*Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*,
835 N.E.2d 701 (Ohio 2005) .................................................................................. 8

*District of Columbia v. Beretta, U.S.A. Corp.*,
872 A.2d 633 (D.C. 2005) ............................................................................ 10, 13

*Ganim v. Smith & Wesson Corp.*,
780 A.2d 98 (Conn. 2001) ................................................................................... 10

*Hager v. Waste Techs. Indus.*,
No. 2000-CO-45, 2002 WL 1483913 (Ohio Ct. App. June 27, 2002) ................................... 21

*Hickok v. Hine*,
23 Ohio St. 523 (1872) ...................................................................................... 15

*Holmes v. Securities Investor Protection Corp.*,
503 U.S. 258 (1992) ..................................................................................... 11, 12

*In re Foreclosure Cases*,
2007 U.S. Dist. LEXIS 84011 (N.D. Ohio Oct. 31, 2007) .................................................. 14

*In re Foreclosure Cases*,
2007 U.S. Dist. LEXIS 95673 (S.D. Ohio. Dec. 27, 2007) ................................................. 14

*In re Lead Paint Litigation*,
924 A.2d 484 (N.J. 2007) .................................................................................... 10

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) ........................................................................................... 5

*Perry v. American Tobacco Company*,
324 F.3d 845 (6th Cir. 2003) ............................................................................... 11

*R.G. Financial Corp. v. Vergara-Nunez*,
446 F.3d 178 (1st Cir. 2006) ................................................................................. 5

*Rhode Island v. Lead Indus. Ass'n*,
951 A.2d 428 (R.I. 2008) ................................................................... 10, 12, 15, 16

# TABLE OF AUTHORITIES

Page

*Riegel v. Medtronic, Inc.*,
128 S. Ct. 999 (2008)...................................................................................................... 5

*RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*,
No. 87382, 2006 WL 2777159 (Ohio App. Ct. 2006)................................................ 8

*San Diego Building Trades Council v. Garmon*,
359 U.S. 236 (1959) .................................................................................................. 6

*Santalucia v. Sebright Transp., Inc.*,
232 F.3d 293 (2d Cir. 2000)...................................................................................... 23

*State ex rel. Ewing v. "Without A Stitch"*,
276 N.E.2d 655 (Ohio Ct. App. 1971)....................................................................... 15

*State ex rel. Heck v. Grillot*,
128 N.E.2d 552 (Ohio Ct. C.P. 1955)........................................................................ 15

*Strock v. Pressnell*,
527 N.E.2d 1235 (Ohio 1988)..................................................................................... 7

*Sturn, Ruger & Co., Inc., v. City of Atlanta*,
560 S.E.2d 525 (Ga. App. Ct. 2002) ......................................................................... 6

*Temple v. Fence One, Inc.*,
No. 85703, 2005 WL 3436354 (Ohio Ct. App. Dec. 15, 2005)................................. 9

*Todd v. Societe Bic, S.A.*,
21 F.3d 1402 (7th Cir. 1994 (en banc)) ................................................................... 16

*Ultramares Corp. v. Touche, Niven & Co.*,
255 N.Y. 170 (1931)................................................................................................... 8

*Yackee v. Village of Napoleon*,
21 N.E.2d 111 (1939) ................................................................................................. 15

*Young v. Bryco Arms*,
821 N.E.2d 1078 (Ill. 2004) ................................................................................. 10, 12

## Statutes

Ohio Rev. Code
 Section 1.63.......................................................................................................1, 4, 5, 7
 Section 1.63(A)-(B).......................................................................................................... 4
 Section 1321.541 ............................................................................................................. 7
 Section 1322.11 ............................................................................................................... 7
 Section 1349.31 ............................................................................................................... 7
 Section 23071(A)(13)(c)................................................................................................. 22

AM. SUB. S.B. NO. 117 ............................................................................................. 22, 23

# TABLE OF AUTHORITIES

**Page**

AM. SUB. S.B. NO. 80 ................................................................................................ 22, 23

## RULES AND REGULATIONS

12 C.F.R. § 703.2 ......................................................................................................... 5

12 C.F.R. Part 266 (Reg. Z) ...................................................................................... 20

71 Fed. Reg. 58672-01 (Oct. 4, 2006) ...................................................................... 19

Fed. R. Civ. P. 12(b)(6) ........................................................................................... 1, 9

## OTHER AUTHORITIES

Donald G. Gifford, *Public Nuisance as a Mass Products Liab. Tort,*
   71 U. CIN. L.REV. 741 (2003) ............................................................................... 15

Judy Pasternak, *Chicago's Shorebank Earns Interest as a Model for Rebirth,*
   LOS ANGELES TIMES, Feb. 22, 1993 ...................................................................... 2

RESTATEMENT (SECOND) OF TORTS
   Section 821B cmt. f (2008) ............................................................................... 17, 21
   Section 821B cmt. g (1979) ..................................................................................... 15
   Section 821B(1) (1979) ............................................................................................. 9

Stephen Ornstein et al., "Ohio S.B. 185,"
   61 *Cons. Fin. L.Q.R.* 94 (2007) .............................................................................. 7

Defendants Option One Mortgage Corporation, Ameriquest Mortgage Securities, Inc., Countrywide Securities Corporation, HSBC Securities (USA) Inc., Washington Mutual Bank, and NovaStar Mortgage, Inc. respectfully submit this memorandum in support of their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).[1]

## STATEMENT OF ISSUES

I.     Whether Ohio Rev. Code Section 1.63, which prevents municipalities from regulating lending practices "directly or indirectly" by ordinance "or other action," bars the City of Cleveland ("the City") from pursuing a public nuisance claim to attack the mortgage lending practices challenged in the City's complaint.

II.     Whether the economic loss doctrine bars the City's claim for public nuisance where it seeks recovery exclusively for alleged financial harm.

III.     Whether the City can state a claim for public nuisance where (1) defendants did not proximately cause the increase in defaults and related foreclosures in Cleveland, which are the result of a complex confluence of economic factors; (2) defendants' alleged conduct did not "unreasonably interfere" with a "public right" because the very loan structures challenged in the City's complaint were understood, regulated, and promoted by federal banking regulators over the past decade and the original mortgage transactions at issue (as well as any later foreclosures) concerned contractual relationships between individual parties; (3) and *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002) was legislatively overruled.

---

[1]     These defendants incorporate by reference herein the arguments advanced by Defendants Citibank, N.A. and Citibank Global Markets Inc. in their Memorandum in Support of Motion to Dismiss the Second Amended Complaint relating to the preemption afforded to all defendants to the extent those defendants purchased loans from national banks or federal savings associations.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Two years after the Ohio Supreme Court held that the City of Cleveland lacks legal authority to regulate the mortgage market, the City has filed a lawsuit aimed at achieving through civil litigation what it was unable to achieve by local ordinance.  The sole claim advanced in this lawsuit is that the extension of mortgage loans to Cleveland residents was a "public nuisance." Putting aside the irony that one of the most important problems that faced American cities in the past 20 years was the *lack* of mortgage credit,[2] our research has revealed no court in the United States that ever has held that mortgage lending, subprime or otherwise, constitutes a public nuisance.  On the contrary, state supreme courts and federal courts around the country have rejected analogous efforts to leverage the public nuisance doctrine to remake public policy in a variety of areas.  This Court should do likewise, and should reject the City's invitation to make housing policy through judicial fiat for a number of independent reasons.

*First*, the Ohio General Assembly has preempted the power of municipalities like the City to regulate the business of originating, granting, servicing, and collecting loans.  While the Ohio Supreme Court recently struck down the City's attempt to regulate mortgage lending by ordinance, the statutory prohibition adopted by the General Assembly applies not only to ordinances, but also to all other actions that would regulate lending either directly or indirectly. There can be no question that the City's complaint here seeks to regulate the mortgage market. The central premise of the City's case is that, on balance, the macroeconomic effects of subprime mortgage lending are negative – that the positive effect of making more housing credit available to more Cleveland residents is more than offset by the increased costs of police and garbage collection and the decrease in tax revenues that occur when some of those loans result in default

and foreclosure.  (*See, e.g.,* Second Amended Complaint ("SAC") ¶¶ 3, 69-70.)  This kind of public cost-benefit balancing is precisely the sort of decision that the Ohio General Assembly has reserved for itself, to the exclusion of municipalities like the City.  For this reason alone, the complaint must be dismissed in its entirety.  (*See* Section I *infra*.)

**Second**, the City's public nuisance claim is barred by the economic loss doctrine, which prohibits the invocation of tort remedies for purely economic harm.  Whatever the merits of previous public nuisance lawsuits seeking damages caused by gun-related violence, lead-paint poisoning, or tobacco-related illnesses (and most such cases have been rejected for other reasons or superseded by legislation), those actions at least involved allegations of actual physical harm and sought relief for the related effects of those physical injuries.  This case does not.  Here, the City's sole allegation is that it lost money through reduced tax revenues and increased public service expenditures because of mortgage foreclosures resulting from borrower defaults.  The economic loss doctrine applies to bar public nuisance claims in these circumstances, and for this independent reason the complaint must be dismissed in its entirety.  (*See* Section II *infra*.)

**Third**, the complaint fails to state a claim of public nuisance on the merits.  For one thing, the complaint itself acknowledges that the increase in defaults and related foreclosures in Cleveland is the result of a complex confluence of economic factors, including "the City's struggling, Rust-Belt economy, the fading prominence of the manufacturing sector, and Cleveland's challenges in attracting a meaningful replacement."  (SAC ¶ 55.)  Mortgage lending, subprime or otherwise, therefore cannot have been the proximate cause of the City's decline in tax revenues or increase in public service expenditures.  Nor can defendants' mortgage-related activities have interfered with a "public right" as public nuisance law requires, given that the

---

2       *See, e.g.,* Judy Pasternak, *Chicago's Shorebank Earns Interest as a Model for Rebirth,* Los Angeles Times, Feb. 22, 1993 ("The issue is an urgent one.  Recent studies have documented a lack of credit in the

original mortgage transactions (like any later foreclosures) concerned contractual relationships between individual parties, and did not affect any right common to the general public.  And in any event, the defendants' alleged conduct in facilitating a market in subprime mortgages cannot have "unreasonably interfered" with any public right, since the very loan structures challenged in the City's complaint were understood, regulated, and even promoted by federal banking regulators over the past decade.  (*See* Section III *infra*.)

In short, this action is legally meritless.  This Court should decline the invitation to become the first court in the United States to decide that mortgage lending constitutes a public nuisance.  The complaint should be dismissed in its entirety, with prejudice.

**ARGUMENT**

**I.    THE CITY'S PUBLIC NUISANCE CLAIM IS PREEMPTED BY OHIO LAW.**

The City's public nuisance claim seeks to accomplish indirectly through litigation what the Ohio General Assembly has specifically forbidden it from accomplishing directly or indirectly, through local ordinance or otherwise.  Specifically, Ohio law expressly precludes municipalities, including the City of Cleveland, from taking any action, directly or indirectly, to regulate mortgage lending.  Ohio Rev. Code § 1.63, enacted in February 2002, provides:

> The state solely shall regulate the business of originating, granting, servicing, and collecting loans and other forms of credit in the state and the manner in which any such business is conducted, and this regulation shall be in lieu of all other regulation of such activities by any municipal corporation or other political subdivision.  Any ordinance, resolution, regulation, *or other action by a municipal corporation or political subdivision to regulate, directly or indirectly*, the origination, granting, *servicing*, or *collection of loans* or other forms of credit constitutes a conflict with the Revised Code . . . and *is preempted*.

Ohio Rev. Code § 1.63(A)-(B) (emphasis added).

---

inner cities . . . .").

The Ohio Supreme Court recently concluded that Section 1.63 preempted the City's predatory lending ordinance in *American Financial Services Association v. City of Cleveland*, 858 N.E.2d 776 (2006). In *AFSA,* the court considered Cleveland Codified Ordinance 659.02, which purported to prohibit "predatory loans," defined to include certain loans with high-interest-rate and other features. The Ohio Supreme Court concluded that the Cleveland ordinance was preempted under Ohio law. *Id*. at 785-786.

Notwithstanding the Ohio Supreme Court's rejection of its prior attempt to enact local regulations governing lending practices, the City now seeks to use a broad common- law nuisance suit to regulate a far broader swath of lending practices. This attempt at regulation through litigation cannot be countenanced under the unambiguously broad language of Ohio Rev. Code § 1.63. This is plainly an "action" by a "municipal corporation" "to regulate" particular lending practices (including the "servicing"[3] and "collection" of loans) by having these practices declared a public nuisance.

That the City seeks to impose liability for particular mortgage loan foreclosures through civil litigation rather than through municipal legislation does not save its public nuisance claim from the preemptive scope of the Ohio statute. A common law action for damages "can be, indeed is designed to be, a potent method of governing conduct and controlling policy." *See Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1008 (2008). The United States Supreme Court has repeatedly observed that "state power may be exercised as much by a jury's application of a state

---

[3]     While the term "servicing" is not specifically defined in the Ohio statute, the National Credit Union Administration, the federal agency responsible for regulating the activities of federal credit unions, has defined "mortgage servicing" as "the administration of a mortgage loan, including collecting monthly payments and fees, providing recordkeeping and escrow functions, and, if necessary curing defaults and ***foreclosing***." 12 C.F.R. § 703.2 (emphasis added). The Sixth Circuit and other courts similarly have recognized that foreclosure is part of the mortgage servicing function. *See, e.g., Brown v. First Nationwide Mortg. Corp.*, 206 Fed. Appx. 436, 437 (6th Cir. 2006) (mortgage servicer acted as noteholder's agent for purposes of initiating foreclosure proceedings); *R.G. Financial Corp. v. Vergara-Nunez*, 446 F.3d 178, 187 (1st Cir. 2006) (mortgage servicer initiates foreclosure proceedings).

rule of law in a civil lawsuit," as in a regulation or ordinance.  *See BMW v. Gore,* 517 U.S. 559

(1996) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("The test is not the

form in which state power has been applied but, whatever the form, whether such power has in

fact been exercised") and *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 247

(1959) ("[R]egulation can be as effectively exerted through an award of damages as through

some form of preventive relief")).

*City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882 (E.D. Pa. 2000), is

also instructive.  There, the U.S. District Court for the Eastern District of Pennsylvania

considered a public nuisance claim advanced by the City of Philadelphia against various

handgun manufacturers.  *Id.* at 889.  The Pennsylvania legislature had previously removed

Philadelphia's authority to regulate firearms, and the Pennsylvania Supreme Court had struck

down a Philadelphia firearms ordinance as an impermissible regulation of firearms.  *Id.*

Concluding that the later civil litigation was merely another attempt to regulate handguns within

the city limits, the district court rejected the city's public nuisance claim as preempted by the

state statute:

> What the City cannot do by act of the City Council it now seeks to
> accomplish with a lawsuit.  The United States Supreme Court has
> recognized that the judicial process can be viewed as the extension
> of a government's regulatory power.  …  [T]he City's instant
> action seeks to control the gun industry by litigation, an end the
> City could not accomplish by passing an ordinance.  Under
> Pennsylvania law and by unequivocal Pennsylvania Supreme
> Court precedent, the power to regulate firearms within the state
> now lies exclusively with the state legislature.

*Id.* at 889-90.[4]

---

[4] *See also Sturm, Ruger & Co., Inc., v. City of Atlanta*, 560 S.E.2d 525 (Ga. App. Ct. 2002) (lawsuit by city attempting to regulate firearms was preempted as no less a "usurpation of State power" than direct legislation; "[t]he City may not do indirectly that which it cannot do directly").

Precisely so here:  The Ohio General Assembly has prohibited Cleveland from regulating mortgage lending and servicing.  The Ohio Supreme Court has invalidated a Cleveland ordinance that sought to regulate the very loans at issue here.  The City may not accomplish through this public nuisance action what it has already been prohibited from doing by means of a municipal ordinance.

Significantly, the Ohio General Assembly recently reaffirmed its decision to exclude cities from this arena by passing Ohio Substitute Senate Bill 185, which substantially broadened Ohio mortgage lending laws.  *See* Stephen Ornstein et al., "Ohio S.B. 185," 61 *Cons. Fin. L.Q.R.* 94 (2007) (summarizing S.B. 185's 2006 amendments to Ohio mortgage lending laws).  The General Assembly chose not to repeal Section 1.63's express preemption of actions by cities to regulate mortgage lending.  Instead, it delegated to the Ohio Attorney General and county prosecutors exclusive authority to enforce such laws in particular circumstances.  *See* R.C. §§ 1321.541, 1322.11, 1349.31.  Had the General Assembly wanted municipalities like the City to have a role in regulating mortgage lending practices, it would have said so in S.B. 185; tellingly, it did not, signaling that it was perfectly content with the Ohio Supreme Court's decision in *AFSA* that municipalities be denied authority over lending practices.  Because the Ohio General Assembly has well-established authority to restrict availability of state common law actions such as this one, *see, e.g., Strock v. Pressnell*, 527 N.E.2d 1235, 1241 (Ohio 1988), and because it has done so in Section 1.63 by preempting actions by Ohio cities, the City's public nuisance claim must be dismissed as preempted by Ohio law.

## II.    THE CITY'S CLAIM IS BARRED BY THE ECONOMIC LOSS DOCTRINE.

The City's public nuisance claim seeking financial compensation for an allegedly decreased tax base and the increased cost of certain public services cannot survive "[t]he well

-7-

established general rule [] that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*, No. 87382, 2006 WL 2777159, *3 (Ohio Ct. App. 2006) (citing *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 537 N.E.2d 624 (Ohio 1989)). The economic loss doctrine "prevents recovery in tort of damages for purely economic losses." *See RWP*, 2006 WL 2777159, at * 3 (Ohio Ct. App. 2006). The long-accepted rationale for the economic loss doctrine is that, if tort liability were to be expanded to include purely economic injury, defendants would be exposed to "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *See Ultramares Corp. v. Touche, Niven & Co.*, 255 N.Y. 170, 179 (1931). Ohio is one of numerous states recognizing the economic loss doctrine. *See, e.g., Corporex Dev. & Constr. Mgmt. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005) (citing cases and observing that "[t]his rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that 'parties to a commercial transaction should remain free to govern their own affairs.'").

Courts in Ohio and elsewhere have held that the economic loss doctrine applies to public nuisance claims. *See RWP*, 2006 WL 2777159 at *4 (finding "no basis for excusing application of the economic-loss rule in matters such as this where a public nuisance is alleged"); *Ashtabula River Corp. Group II v. Conrail, Inc.*, 549 F.Supp. 2d 981, 987-988 (N.D. Ohio 2008) (claims barred by economic-loss doctrine where "plaintiff's public nuisance claims are tort claims for which only damages for economic loss is sought"); *see also City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1140 (Ill. 2004) ("[B]ecause this court found no reason to treat nuisance

different than any other tort, recovery of damages for solely economic loss would not be permitted.").

In *City of Chicago*, the city sought "more than $433 million in public nuisance action attributable to the alleged public nuisance . . . includ[ing] the expenses of emergency communications and emergency response, health care provided to victims of gun violence, police investigations, and the prosecution and defense of those accused of crimes involving the illegal possession and use of firearms." 821 N.E.2d at 1138-39. The Illinois Supreme Court held that the economic loss doctrine barred the recovery of "solely economic damages" on such facts. *Id.* at 1143. Here, the City's claimed damages are no different from those sought in *City of Chicago*. The City only seeks damages for economic losses, such as decreased tax revenues and the increased costs of public services. Under the economic loss doctrine, the City's public nuisance claim is thus barred and must be dismissed.

## III.    THE CITY'S PUBLIC NUISANCE CLAIM FAILS AS A MATTER OF LAW.

Apart from its threshold defects due to preemption and the economic-loss doctrine, the complaint fails to state a claim for public nuisance as a matter of law. Ohio has adopted the Restatement of Torts' definition of public nuisance: "an unreasonable interference with a right common to the general public." *Temple v. Fence One, Inc.*, No. 85703, 2005 WL 3436354, *5 (Ohio Ct. App. Dec. 15, 2005); RESTATEMENT (SECOND) OF TORTS § 821B(1) (1979). In order to establish an "unreasonable interference," a civil action based on "qualified nuisance" hinges upon pleading and proving negligence. *See Allen Freight Lines v. Consolidated Rail Corp.*, 595 N.E.2d 855, 856 (Ohio 1992).[5] Thus, to state a nuisance claim, the City must plead operative

---

[5]        In contrast, absolute nuisance, or nuisance *per se*, is limited to conduct that is "inherently injurious." *Brown v. County Commissioners of Scioto County*, 622 N.E.2d 1153, 1159 (Ohio Ct. App. 1993). The City does not (and cannot) allege that making subprime mortgages, securitizing them, or foreclosing on defaulted mortgages is "inherently injurious."

facts showing that:  (i) the defendant owed the plaintiff a duty; (ii) the defendant breached its duty; and (iii) the defendant's breach proximately caused plaintiff's alleged injury.  *See Allen Freight*, 595 N.E.2d at 856.  "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice . . . . Even under Rule 12(b)(6), a complaint containing a statement of facts that merely creates a *suspicion* of a legally cognizable right of action is insufficient."  *Bishop v. Lucent Technologies, Inc.*, 520 F.3d 516, 519 (6th Cir. 2008) (emphasis in original) (citing *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007).

In contexts ranging from lead paint to handguns, the vast majority of state supreme courts and federal appellate courts to consider the issue have reached a consensus that the kinds of allegations asserted by the City here does not state a claim for public nuisance.  *See, e.g., Rhode Island v. Lead Indus. Ass'n*, 951 A.2d 428 (R.I. 2008) (dismissing public nuisance claim against lead paint manufacturers); *City of St. Louis v. Benjamin Moore & Co.*, 226 S.W.3d 110 (Mo. 2007) (affirming lower court's dismissal of public nuisance claim against manufacturer of lead paint);  *In re Lead Paint Litigation*, 924 A.2d 484 (N.J. 2007) (dismissing public nuisance claim against lead paint manufacturers); *District of Columbia v. Beretta, U.S.A., Corp.*, 872 A.2d 633, 647 (D.C. 2005) (refusing "to recognize a claim of common-law public nuisance that disregards, or greatly dilutes, the liability-limiting factors"); *Young v. Bryco Arms*, 821 N.E.2d 1078 (Ill. 2004) (holding as a matter of law that a public nuisance firearms claim could not be maintained); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004) (dismissing city's and county's public nuisance claim against handgun manufacturers); *City of Philadelphia v. Beretta*, 277 F.3d 415, 422 (3d Cir. 2002) (affirming district court's dismissal of public nuisance claim

-10-

against gun manufacturers); *Ganim v. Smith & Wesson Corp.,* 780 A.2d 98 (Conn. 2001)

(dismissing common law public nuisance claim against firearms manufacturer).[6]

The frequency and consistency with which previous public nuisance actions have been

dismissed underscores the invalidity of the City's claim here, which fails for three essential

reasons.  First, the complaint makes clear that the defendants did not proximately cause the harm

alleged.  Second, there is no "public right" at issue.  Third, the challenged conduct alleged in the

complaint did not constitute an "unreasonable interference" with such a right.  While the City

might be expected to invoke the Ohio Supreme Court's decision in *City of Cincinnati v. Beretta*

*U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), a product liability action entirely distinct from this

case, that decision was legislatively overruled and is thus neither binding precedent nor

persuasive evidence of how the Ohio Supreme Court would rule on the issue before this Court.

A.   **AS THE COMPLAINT ITSELF MAKES CLEAR, THE DEFENDANTS DID NOT
     PROXIMATELY CAUSE THE ALLEGED HARM.**

The defendants' conduct did not proximately cause the City's alleged injuries.  As the

United States Supreme Court has explained, proximate cause "demand[s] some direct relation

between the injury asserted and injurious conduct alleged."  *Holmes v. Securities Investor*

*Protection Corp.*, 503 U.S. 258, 268 (1992); *see also, e.g., Perry v. American Tobacco*

*Company*, 324 F.3d 845, 850 (6th Cir. 2003) (holding, in agreement with eight other federal

circuits, that claims against tobacco manufacturers by health plans to recover increased health-

related expenses due to smoking are impermissibly indirect).  "When a court evaluates . . .

proximate causation, … the central question it must ask is whether the alleged violation led

---

[6]     A minority of courts have come to the opposite conclusion.  *See, e.g., City of Gary v. Smith &
Wesson*, 801 N.E.2d 1222 (Ind. 2003).  As discussed more fully below, the Ohio Supreme Court initially adopted the
minority view in the context of public nuisance claims based on distribution of dangerous products, *see City of
Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), but that decision – distinguishable in any case
because it arose in the product liability context – was later overruled by statute.

directly to the plaintiff's injury." *Anza v. Ideal Steel Supply Corp.,* 547 U.S. 451, 461 (2006).

The *Holmes* Court articulated three rationales for this "directness" requirement:  (1) the difficulty

in ascertaining whether a claimed injury is attributable to the indirect defendant's conduct, as

distinct from other, independent factors; (2) the complicated rules courts would be forced to

adopt to apportion damages at different levels of injury; and (3) the existence of a directly

injured party who potentially can vindicate the law.  *Holmes.* 503 U.S. at 269; *see also Anza*, 547

U.S. 451 (proximate cause is lacking anytime an injury is indirect, whether or not all three

rationales identified in *Holmes* are present).

The *Anza* Court found proximate cause lacking when it considered claims that the

defendant had defrauded the state taxing authority and used the proceeds to steal customers from

a competitor, in part because of the difficulty of ascertaining whether the defendants' conduct

caused the asserted harm:  "Businesses lose and gain customers for many reasons," the Court

explained, "and it would require a complex assessment to establish what portion of Ideal's lost

sales were the product of [the competitor's] decreased prices."  *Id.* at 459.  The Court also found

that the state taxing authority could pursue a more direct remedy than the plaintiff's, even though

it suffered injuries that were "entirely distinct."  *Id.* at 458-460.

In light of these authorities, defendants' conduct here cannot be deemed the proximate

cause of the City's alleged injuries—the cost of monitoring, maintaining, and demolishing

foreclosed, abandoned properties and decreased tax revenues — as other courts considering

similar public nuisance claims have recognized.  In rejecting a public nuisance claim brought

against manufacturers of lead-based paint, the Supreme Court of Rhode Island observed:

"[L]iability cannot be predicated on a prior and remote cause which merely furnishes the

condition or occasion for an injury resulting from an intervening unrelated and efficient cause,

even though the injury would not have resulted but for such a condition or occasion." *Rhode Island v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 451 (R.I. 2008) (internal quotations omitted). Likewise, the Supreme Court of Illinois rejected public nuisance claims asserted against handgun manufacturers because proximate cause was lacking where defendants' business practices "merely create[d] a condition that [made] eventual harm possible." *Young v. Bryco Arms*, 821 N.E.2d 1078, 1090 (Ill. 2004); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1138 (Ill. 2004) ("[t]his is one of those instances in which a party may have contributed in some remote way to the harm and yet it is inappropriate to subject that party to tort liability."). *See also District of Columbia v. Beretta U.S.A., Corp.,* 872 A.2d 633 (D.C. 2005) (finding no proximate cause, stating the court is "doubly unpersuaded of the necessity or wisdom of adopting judicially a right of action for public nuisance . . . in order to address a myriad of societal problems regardless of the distance between the causes of the problems and their alleged consequences.") (internal citation omitted).

The chain of causation outlined in the City's complaint here is at least as convoluted as those found legally defective in these precedents. The City's theory for why defendants are liable for the City's foreclosure problem incorporates an attenuated, multi-step chain of causation involving underwriters, trusts, mortgage lenders, mortgage brokers, consumers, and the various changing relationships between each of these categories of persons or entities.[7] And, just as "[b]usinesses lose and gain customers for many reasons," *Anza*, 547 U.S. at 459, cities lose jobs and residents, and experience rising and falling foreclosure rates, for many complicated macro- and micro-economic reasons some of which the City specifically identifies in its complaint. The

---

[7] The complaint alleges "Underwriters" would sell securities to investors; the securities were issued by "Trusts" and were backed by mortgages (both prime and subprime); the mortgages were pooled by a "Depositor," which had bought the mortgages from numerous and varied "Originators;" who processed loan applications and disbursed funds to borrowers who were located by "Mortgage Brokers." *See* SAC, ¶ 40, 44.

City attributes rising default and foreclosure rates to "the City's struggling, Rust-Belt economy, the fading prominence of the manufacturing sector, and Cleveland's challenges in attracting a meaningful replacement," among other things.  (SAC ¶ 55.)  Foreclosures, in turn, allegedly were one (but only one) of the reasons why property values have declined in Cleveland, which decline in turn contributed to lost tax revenues, which in turn increased the budgetary strain associated with increased expenses in monitoring, maintaining, and demolishing property.  To understand the complexity of the market forces the City challenges, the Court need look no further than the flow chart set forth on page 10 of the Second Amended Complaint – a chart that shows no fewer than eight different categories of market actors, each with a different role and each responding to different economic incentives that allegedly add up collectively to the supposed nuisance the City now seeks to remedy.  (*See* SAC ¶ 40.)  Untangling this web of causation would necessitate precisely the kind of "'intricate, uncertain' inquiry . . . that the *Anza* Court warned against."  *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 983 (9th Cir. 2008) (quoting *Anza*, 547 U.S. at 460).

The other rationale discussed in *Anza* only confirms the impermissibly indirect nature of the City's theory of causation here.  *Anza* noted the possibility that a more "immediate victim[]," the state taxing authority, could "vindicate the laws by pursuing [its] own claims," and that its claims would be more "straightforward" to adjudicate.  *Id.*  Here, individual homeowners have remedies available to them that are far more straightforward and direct than the City's. Mortgage lending in Ohio is subject to a comprehensive set of state and federal laws and regulations.  Individual borrowers facing foreclosure can (and frequently do) defend against foreclosure actions, and even assert affirmative claims for wrongful foreclosure in individual cases where foreclosure is in fact improper.  *See, e.g., In re Foreclosure Cases*, 2007 U.S. Dist.

-14-

LEXIS 84011 (N.D. Ohio Oct. 31, 2007); *In re Foreclosure Cases*, 2007 U.S. Dist. LEXIS

95673 (S.D. Ohio. Dec. 27, 2007).  Thus, the borrowers actually affected by default and

foreclosure have an array of remedies available in cases that actually involve unlawful lending

practices or wrongful foreclosure.  Under *Anza*, the availability of such remedies is yet another

reason why the directness requirement of public nuisance is not satisfied here.

### B.  THE DEFENDANTS DID NOT INTERFERE WITH A "PUBLIC RIGHT."

"Conduct does not become a public nuisance merely because it interferes with a large

number of people."  *Brown*, 622 N.E.2d at 712.  Rather, a plaintiff must allege the existence of a

"right common to the general public," to plead a viable public nuisance claim.  *Id*.  A public right

is "collective in nature and not like the individual right that everyone has not to be assaulted or

defamed or defrauded or negligently injured."  RESTATEMENT (SECOND) OF TORTS § 821B cmt. g

(1979).  As the Supreme Court of Rhode Island summarized in rejecting public nuisance claims

against lead paint manufacturers:

> That which might benefit (or harm) "the public interest" is a far
> broader category than that which actually violates a "public right."
> For example, while promoting the economy may be in the public
> interest, there is no public right to a certain standard of living (or
> even a private right to hold a job).  Similarly, while it is in the
> public interest to promote the health and well-being of citizens
> generally, there is no common law public right to a certain
> standard of medical care or housing.

*See Rhode Island v. Lead Industries Ass'n, Inc.*, 951 A.2d 428, 448 (R.I. 2008) (quoting

Donald G. Gifford, *Public Nuisance as a Mass Products Liab. Tort,* 71 U. CIN. L.REV. 741, 815

(2003)).

The Ohio common law of public nuisance recognizes public rights in specific areas of

public health and safety.  For example, Ohio courts have found a public right to be free from

disruptions to public travel, *Yackee v. Village of Napoleon*, 21 N.E.2d 111, 113 (1939);

exhibition of obscenity, *State ex rel. Ewing v. "Without A Stitch"*, 276 N.E.2d 655, 660 (Ohio Ct. App. 1971); inherently dangerous animals, *City of Warren v. Testa*, 461 N.E.2d 1354, 1361 (Ohio Ct. C.P. 1983); obstruction of navigable rivers, *Hickok v. Hine*, 23 Ohio St. 523 (1872); and noxious waste and fumes, *State ex rel. Heck v. Grillot*, 128 N.E.2d 552, 553 (Ohio Ct. C.P. 1955).

By contrast, courts have consistently refused to hold that incidents that do not inherently affect the public at large affect a "public right."  In *Lead Industries Ass'n, Inc.*, for example, the Rhode Island Supreme Court concluded that there was no "public right" to be free from the dangers potentially posed by lead paint even though large numbers of people might live in houses containing the substance.  "Were we to hold otherwise, we would change the meaning of public right to encompass all behavior that causes a widespread interference with the private rights of numerous individuals."  951 A.2d at 455.  "[W]e see no reason to depart from the long-standing principle that a public right is a right of the public to shared resources such as air, water, or public rights of way."  Likewise, in *City of Chicago v. Beretta,* 821 N.E.2d 1099 (Ill. 2004), the Illinois Supreme Court held that there was no public right to be "free from unreasonable jeopardy to health, welfare, and safety, and from unreasonable threats of danger to person and property, caused by the presence of illegal weapons in the city of Chicago."  *Id*. at 1114.  In so holding, the court reasoned "we are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone or some other instrumentality) in a manner than may create a risk of harm to another."  *Id*. at 1116).

These cases are instructive, particularly because no court in the United States has ever held that the origination, securitization, or foreclosure of mortgage loans constitutes a public

nuisance.  "'[W]hen given a choice between an interpretation of [state] law which reasonably restricts liability, and one which greatly expands liability,'" a federal court "'should choose the narrower and more reasonable path.'"  *Combs v. International Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004) ) (quoting *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1412 (7th Cir. 1994 (en banc)). The narrow and reasonable path here is to decline to create a never-before-recognized "public right" to be free from the origination, securitization, or foreclosure of mortgage loans.

C.    THE DEFENDANTS' ALLEGED CONDUCT DOES NOT CONSTITUTE AN "UNREASONABLE INTERFERENCE."

In addition to failing to allege a legally cognizable "public right," the City is unable to allege an "unreasonable interference" with such a right.  Under well-established law, conduct authorized by statute, ordinance, or administrative regulation can never amount to an "unreasonable interference" with a public right.  *See Allen Freight*, 595 N.E.2d at 857 ("What may have been a nuisance at common law no longer can be, according to the proper exercise of legislative authority").  Even if the law does not expressly authorize certain conduct, it still cannot constitute an "unreasonable interference" if it complies with "a comprehensive set of legislative acts or administrative regulations."  *Brown*, 622 N.E.2d at 1159; Restatement (Second) of Torts § 821B cmt. f (2008) ("[I]f there has been established a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct, the courts are slow to declare an activity to be a public nuisance if it complies with the regulations.").  Both factors—legal authorization of subprime lending and comprehensive regulation of it—compel dismissal here.

The core "interference" the City hypothesizes here is the origination of loans with features the City alleges "significantly increased the intrinsically high risk of subprime mortgages" (SAC ¶ 50) – features such as hybrid adjustable rate structures, low- and no-

-17-

documentation loans, and interest-only loans.  (*Id.* ¶ 49.)  The City ignores that these and other features of subprime mortgage lending were, in fact, recognized by federal regulators and understood to be common in the mortgage industry.  For example, on March 1, 1999, the Office of the Comptroller of the Currency ("OCC"), the Federal Deposit Insurance Corporation ("FDIC"), the Board of Governors of the Federal Reserve Board ("FRB"), the Office of Thrift Supervision ("OTS") and National Credit Union Administration ("NCUA") published their "Interagency Guidance on Subprime Lending."[8]  While this guidance emphasized the need for consumer-protection programs, it did not outlaw any of the loan structures challenged by the City here.

These same federal agencies published an "Expanded Guidance for Subprime Lending Programs," in 2001.[9]  The agencies noted that the term "subprime" is not synonymous with "predatory" or "abusive" lending and that "the Agencies have previously expressed their support for lending practices designed to responsibly service customers and enhance credit access for borrowers with special credit needs."[10]  Yet the federal banking agencies expressly recognized that loan structures designed to serve borrowers with impaired credit "may be prone to rapid deterioration, especially in the early stages of an economic downturn," while observing that "effective control systems can provide the lead time necessary to react to deteriorating conditions."[11]  Federal guidance thus did not put the industry on notice that loan structures designed to increase credit availability to historically underserved populations might one day be deemed a public nuisance if those loans experienced an increased default rate in an economic downturn.  To the contrary: this guidance signaled the industry that the regulators were aware of

---

[8]     Available at http://www.federalreserve.gov/boarddocs/srLETTERS/1999/sr9906a1.pdf.
[9]     Available at http://www.fdic.gov/news/news/press/2001/pr0901a.html.
[10]    *Id.* at 10.
[11]    *Id.*

that possibility, but nonetheless believed it appropriate to develop loan products with some of the very features plaintiff challenges here.

On March 11, 2004, the FRB and FDIC published guidance entitled "Unfair or Deceptive Acts or Practices by State-Chartered Banks."[12]  This guidance essentially rejected the unfairness analysis urged by plaintiff here – namely, that a loan product is improper merely because it might be more expensive than loan products offered to borrowers with better credit, or because it might entail higher default risk than such loan products.  (*Cf.* SAC ¶ 50.)  Instead, the guidance stated that loan structures that result in a "wider availability of products and services" suggest that such structures are actually good for borrowers.[13]  The guidance further expressly recognized the use and permissibility of loans with introductory rates,[14] one of the features the City challenges here.  (*See* SAC ¶ 49.)

In October 2006, the federal banking agencies issued their "Interagency Guidance on Nontraditional Mortgage Product Risks."  *See* 71 Fed. Reg. 58672-01 (Oct. 4, 2006).  This guidance addressed a variety of nontraditional mortgage structures, including the "interest-only" structure the City challenges here.  (*See* SAC ¶ 49.)  Yet the agencies were clear that "[i]nstitutions with sound underwriting, adequate risk management, and acceptable portfolio performance will not be subject to criticism merely for offering such products."  *Id*.  And as for adjustable rate mortgages (*cf.* SAC ¶ 49), the agencies demonstrated their full awareness of structures in which, after an introductory period, interest rates would rise considerably.  The agencies warned against structures that could cause "extraordinary payment shock," while making clear that the mere fact of a substantially higher adjusted interest rate is not impermissible.  *See id*.

---

12    Available at http://www.federalreserve.gov/boarddocs/press/bcreg/2004/20040311/attachment.pdf.
13    *Id.* at 3.

In their July 2007 "Statement on Subprime Mortgage Lending," the banking agencies addressed many of the loan structures that the City now characterizes as a nuisance and, while urging careful management and oversight of such structures, rejected the suggestion that such structures are improper.  The July 2007 interagency statement stated that "there is no presumption that the loans to which the Statement applies are predatory."[15]  And yet the loan structures and features covered by the interagency statement are the very structures and features addressed in the City's complaint here: "stated income" loans (also known as "no-documentation loans"), loans with low introductory rates that reset to significantly higher rates, and others.[16]

This decade-long history of attention by the federal banking regulators to the practices the City now challenges as an "unreasonable interference" with a public right culminated in the issuance, on July 14, 2008, of the FRB's final rule amending Regulation Z, 12 C.F.R. Part 266.[17] This new regulation directly addresses the City's concern about approving mortgage loans without either documenting the borrower's income and assets or taking into account the borrower's ability to make payments beyond the introductory-rate period.[18]  But the FRB's newly adopted rules on these and other practices that are the subject of the City's claim here do not take effect until October 1, 2009, underscoring that (a) the practices at issue have never heretofore been regarded as unlawful or improper, and (b) during the time period covered by the City's complaint, the defendant's alleged lending practices could not have been deemed an "unreasonable interference" with anything.

---

14      *Id.* at 7.
15      http://www.occ.treas.gov/ftp/release/2007-64a.pdf.
16      *See id.*
17      *See* http://www.federalreserve.gov/newsevents/press/bcreg/20080714a.htm.
18      *See id.* at 49-51.

Given the federal government's scrutiny, regulation, and authorization of the very lending practices the City challenges, the City cannot establish that subprime mortgage lending amounts to an "unreasonabl[e] interfere[nce]" with a "public right."  *Allen Freight*, 595 N.E.2d at 857; *see also Hager v. Waste Techs. Indus.*, No. 2000-CO-45, 2002 WL 1483913 (Ohio Ct. App. June 27, 2002) ("Since WTI's waste incineration facility operates under sanction of law, based on that fact alone, it cannot be a common law public nuisance."); *City of Mingo Junction v. Sheline*, 196 N.E. 897, 897 (Ohio 1935) ("Certainly what the law sanctions cannot be held to be a public nuisance").

Comprehensive regulation typically signifies "[t]he variety and complexity of a problem," which, in turn, suggests that a particular decision dealing with the problem "should be a part of an overall plan prepared with a knowledge of matters not presented to the court and of interests not represented before it."  Restatement of Torts (Second) § 821B cmt. f.  These overarching complexities in highly regulated areas call for "judicial restraint" when determining whether to expand the blunt instrument of public nuisance doctrine because the institutional advantages of the political branches of government better suit them to balance the many competing interests.  *Id.*  For this additional reason, the City's claim must be dismissed.

**D.**   ***Beretta* Is Not Persuasive Authority In Light Of Its Abrogation By Statute And Non-Analogous Fact Pattern.**

The Ohio Supreme Court's decision in *City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002), does not save plaintiff's claim from dismissal.  *Beretta* was at its heart a product liability case in which the City of Cincinnati alleged that the defendants "manufactured, marketed and distributed firearms in ways to ensure the widespread accessibility of the firearms to prohibited users, including children and criminals," allegedly creating a public nuisance in Cincinnati.  The nature of the nuisance was that the distribution of handguns led to

-21-

"criminal misuse" – *i.e.*, illegal acts of physical violence – which, in turn, led to increased public health care and emergency-response costs. *Id.* at 1140). The Court held that, under the circumstances alleged, the city could state a claim for public nuisance. *Id.* at 1143-44. *Beretta* is obviously distinct from the claims here in a number of critical respects, including that the conduct at issue there resulted in physical injuries (gunshot wounds necessitating medical care, among others) sufficient to render the economic loss doctrine inapplicable and that the effect on public safety implicated a public right beyond anything at issue here.

More important, however, *Beretta*) was subsequently abrogated by the Ohio General Assembly which, after *Beretta*, amended the Ohio Product Liability Act ("OPLA") to expressly provide "that the product liability statutes are intended to abrogate common law product liability causes of action." AM. SUB. S.B. NO. 80 (effective April 7, 2005). In subsequent legislation, the legislature further clarified that its intent in enacting S.B. No. 80 was to specifically abrogate public nuisance claims based on the manufacture and sale of products. *See* AM. SUB. S.B. NO. 117 (2006). Specifically, in enacting S.B. 117, the legislature amended the OPLA's definition of "product liability claim" to expressly include "any public nuisance claim or cause of action at common law in which it is alleged that the design, manufacture, supply, marketing, distribution, promotion, advertising, labeling, or sale of a product unreasonably interferes with a right common to the general public." *See* AM. SUB. S.B. NO. 117 (2006); Ohio Rev. Code § 23071(A)(13)(c). Thus, the core foundation of *Beretta* – that a public nuisance claim can be stated based on the public health and safety effects of distributing dangerous products – has been abrogated by statute.

That *Beretta* is no longer a viable precedent to support a public nuisance claim was recently confirmed by *City of Toledo v. Sherwin-Williams Co.*, No. CI 200606040, 2007 WL

4965044 (Ohio Com. Pl. Dec. 12, 2007).  In that case, the trial court rejected the City of Toledo's

public nuisance claim against a lead paint manufacturer.  *Id.* at pp. 1-2.  In dismissing this claim,

the court specifically held that the Ohio legislature had intended such claims to be entirely

supplanted by the OPLA.  *See id.*  In response to plaintiff's argument that *Beretta* nonetheless

permitted the public nuisance claim to proceed, the trial court responded that "*Beretta* was

decided and written prior to the enactment of S.B. 80 which provided that the product liability

statutes were intended to abrogate common law product liability causes of action. . . . [T]he later

S.B. 117 intended to clarify the legislature[']s original intent of including public nuisance claims

within the OPLA."  *Id.* at p.2, n.2.

Sitting in diversity, this court should address undecided issues of state law by "carefully

predict[ing] how the state's highest court would resolve the uncertainty," *Santalucia v. Sebright

Transp., Inc.*, 232 F.3d 293, 297 (2d Cir. 2000); *Certified Restoration Dry Cleaning Network,

L.L.C. v. Tenke Corp.*, 511 F.3d 535, 541 (6th Cir. 2007) (court must anticipate how state's

highest court would rule on the issue).  Here, in light of S.B. 80 and S.B. 117 which abrogate

*Beretta*'s) core holding, as well as the factual distinctions between an illegal market for

dangerous handguns and a federally-regulated market for mortgage lending, the only reasonable

conclusion is that the Ohio Supreme Court would not permit a public nuisance claim to proceed

on these facts.[19]  Given the weight of authority in other jurisdictions and the unprecedented leap

that would be required in crediting the City's theory of liability, this Court should "choose the

narrower and more reasonable path" of refusing to expand the common law of public nuisance to

encompass the City's claim.  *See Combs v. International Ins. Co.*, 354 F.3d 568, 577 (6th Cir.

2004).

---

[19]      As a practical matter, this conclusion is all the clearer given that only one of the four Justices in the *Beretta*
majority remains on the court, while two of the dissenters (including the dissent's author) remain.

## CONCLUSION

For each of these reasons, the Court should enter judgment dismissing the City's

complaint in its entirety, with prejudice.

## TRACK AND PAGE LIMIT CERTIFICATION

Undersigned counsel hereby certifies that this case has been assigned to the complex

track.  Undersigned counsel further certifies that this motion adheres to the thirty (30) page

limitation set forth in Local Rule 7.1(f) for complex track cases.


Respectfully submitted,

*Attorneys for Defendant Option One*          /s/ Joseph T. Dattilo
*Mortgage Corp.*                              Joseph Dattilo (0010398)
                                              Michael P. O'Donnell (0078390)
                                              BROUSE MCDOWELL
                                              1001 Lakeside Avenue, Suite 1600
                                              Cleveland, OH  44114
                                              Tel:    (216) 830-6830
                                              Fax:    (216) 830-6807
                                              Email:  jdattilo@brouse.com
                                                      modonnell@brouse.com

                                              Brian P. Brooks *(pro hac vice)*
                                              O'MELVENY & MYERS LLP
                                              1625 Eye Street, N.W.
                                              Washington, D.C.  20006
                                              Tel:    (202) 383-5127
                                              Fax:    (202) 383-5414
                                              Email:  bbrooks@omm.com

                                              Elizabeth L. McKeen *(pro hac vice)*
                                              O'MELVENY & MYERS LLP
                                              610 Newport Center Drive, 17th Floor
                                              Newport Beach, CA 92660
                                              Tel:    (949) 823-7150
                                              Fax:    (949) 823-6994
                                              Email:  emckeen@omm.com

*Attorneys for Defendant Countrywide Securities Corp.*

/s/ James S. Wertheim
James S. Wertheim, Esq.
MCGLINCHEY STAFFORD
25550 Chagrin Boulevard, Suite 406
Cleveland, OH  44122
Tel:     (216) 378-9905
Fax:     (216) 378-9910
Email:   jwertheim@mcglinchey.com

Thomas M. Hefferon *(pro hac vice)*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
Tel:     (202) 346-4000
Fax:     (202) 346-4444
Email:   thefferon@goodwinprocter.com

James W. McGarry *(pro hac vice)*
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA  02109
Tel:     (617) 570-1000
Fax:     (617) 523-1231
Email:   jmcgarry@goodwinprocter.com

*Attorneys for Defendant HSBC Securities (USA) Inc.*

/s/ Robert B. Casarona
Robert B. Casarona (0036715)
ROETZEL & ANDRESS, LPA
1375 E. Ninth Street
One Cleveland Center, 9th Floor
Cleveland, Ohio 44114
Tel:     (216) 615-4841
Fax:     (216) 623-0134
Email    rcasarona@ralaw.com

Of Counsel:

David H. Kistenbroker
Theresa L. Davis
KATTEN MUCHIN ROSENMAN LLP
525 W. Monroe Street, Suite 1900
Chicago, Illinois  60661
Tel:     (312) 902-5206
Fax:     (312) 577-4725
Email    david.kistenbroker@kattenlaw.com
Email    theresa.davis@kattenlaw.com

|  |  |
|---|---|
| *Attorneys for Defendant Ameriquest Mortgage Securities, Inc.* | /s/ Robert D. Kehoe |

Robert D. Kehoe, Esq. (0017466)
Joseph J. Jerse, Esq.
KEHOE & ASSOCIATES
900 Baker Building
1940 East Sixth Street
Cleveland, OH   44114
Tel:     (216) 621-1500
Fax:     (216) 621-1501
Email    rdkehoe@kehoelaw.net
Email    jjjerse@kehoelaw.net

Of Counsel:

Bernard LeSage, Esq. *(pro hac vice)*
BUCHALTER NEMER
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA   90017-2457
Tel:     (213) 891-5230
Fax:     (213) 630-5715
Email:   blesage@buchalter.com

Joanne N. Davies, Esq. *(pro hac vice)*
BUCHALTER NEMER
18400 Von Karman Avenue, Suite 800
Irvine, CA   92612-0514
Tel:     (949) 224-6221
Fax:     (949) 224-6209
Email:   jdavies@buchalter.com

*Attorneys for Defendant NovaStar Mortgage, Inc.*

/s/ Martin M. Loring

Martin M. Loring *(pro hac vice)*
HUSCH BLACKWELL SANDERS, LLP
4801 Main Street, Suite 1000
Kansas City  MO  64112
Tel:     (816) 983-8000
Fax:     (816) 983-8080
Email:   martin.loring@huschblackwell.com

John F. Marsh (0065345)
HAHN LOESER + PARKS LLP
65 E. State Street, 14th Floor
Columbus, Ohio  43215
Tel:     (614) 233-5102
Fax:     (614) 221-5909
Email:   jmarsh@hahnlaw.com

*Attorneys for Defendant Washington Mutual Bank*

/s/ Dan L. Makee

Dan L. Makee, Esq. (0029602)
MCDONALD HOPKINS
2100 Bank One Center
600 Superior Avenue, East
Cleveland, OH  44114
Tel:     (216) 348-5731
Fax:     (216) 348-5474
Email:   dmakee@mcdonaldhopkins.com

Thomas M. Hefferon *(pro hac vice)*
GOODWIN PROCTER LLP
901 New York Avenue, N.W.
Washington, D.C.  20001
Tel:     (202) 346-4000
Fax:     (202) 346-4444
Email:   thefferon@goodwinprocter.com

James W. McGarry *(pro hac vice)*
GOODWIN PROCTER LLP
Exchange Place
53 State Street
Boston, MA  02109
Tel:     (617) 570-1000
Fax:     (617) 523-1231
Email:  jmcgarry@goodwinprocter.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 24, 2008, I electronically filed this document with the Clerk of Court using the CM/ECF system, which will automatically send email notification of such filing to all CM/ECF participants.  I further certify that I have mailed by United States Postal Service the document to any non-CM/ECF participants.


/s/ Joseph T. Dattilo
One of the attorneys for Option One
Mortgage Corporation

733559