# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| CITY OF CLEVELAND, | ) | CASE NO. 1:08 cv 139 |
| | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| AMERIQUEST MORTGAGE | ) | AND ORDER |
| SECURITIES, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter comes before the Court on motions to dismiss pursuant to Rule 12(b)(6) filed by all defendants. The matter has been fully briefed and is ripe for decision.

## I. Factual & Procedural Background

In its Second Amended Complaint ("SAC"), plaintiff City of Cleveland (the "City" or "Plaintiff") asserts a single public nuisance cause of action against each of the following corporate defendants: Ameriquest Mortgage Securities, Inc., Bank of America, N.A., Bear Stearns & Co., Inc., Citibank, N.A., Citigroup Global Markets, Inc., Countrywide Securities Corporation, Credit Suisse First Boston LLC, Credit Suisse (USA), Inc., Deutsche Bank Securities, Inc., GMAC-RFC Holding Company, Goldman Sachs & Co., Greenwich Capital Markets, Inc., HSBC Securities (USA), Inc., JP Morgan Acquisition Corp., Chase Bank USA, N.A., Merrill Lynch, Pierce, Fenner & Smith Inc., Morgan Stanley & Co., Inc., Novastar

Mortgage, Inc., Option One Mortgage Corporation, Washington Mutual Bank, Wells Fargo Bank, N.A., and Wells Fargo Asset Securities Corporation (collectively, "Defendants").

Plaintiff blames subprime lending for the epidemic of foreclosures afflicting the City. Plaintiff claims that subprime lending was categorically inappropriate for Cleveland due to its "unique" economic situation, characterized by a high poverty rate, sluggish economy, limited employment opportunities, and stable but not booming property values. The SAC targets Defendants not for engaging in direct subprime lending, but instead for their alleged role in securitizing subprime loans into mortgage-backed securities ("MBS"). This allegation appears calculated to capture the related activities of (1) creating MBS by bundling together subprime loans and/or (2) providing the funding used to purchase the underlying loans. Plaintiff asserts that this conduct created a public nuisance, with the resulting spike in foreclosure activity being its foreseeable result. The City seeks to recover damages it claims are represented by (1) the cost of monitoring, maintaining, and demolishing foreclosed properties; and (2) the diminution in the City's property tax revenues caused by the depreciating effect foreclosures have had on the affected homes and surrounding properties.

Via eight separate motions to dismiss – some filed individually and others in combination – Defendants move to dismiss the SAC under Rule 12(b)(6) for failure to state a claim for relief.[1] Individual defendants and groups of defendants present numerous arguments in

---

[1] Defendants filed a total of eight motions to dismiss:
Doc. No. 197 – Option One Mortgage Corp., Ameriquest Mortgage Securities, Inc., Countrywide Securities Corp., HSBC Securities (USA) Inc., Washington Mutual Bank, and Novastar Mortgage, Inc.
Doc. No. 199 – Greenwich Capital Markets, Inc., Morgan Stanley & Co., Inc., Credit Suisse Securities (USA) LLC, Credit Suisse (USA), Inc., Goldman Sachs & Co., and Merrill Lynch, Pierce, Fenner & Smith, Inc.
Doc. No. 202 – Wells Fargo Bank, N.A. and Wells Fargo Asset Securities Corporation
Doc. No. 205 – Citibank, N.A. and Citigroup Global Markets, Inc.
Doc. No. 207 – JP Morgan Acquisition Corp., Bear Stearns & Co., Inc., and Chase Bank USA, N.A.
Doc. No. 208 – Deutsche Bank Securities, Inc.
Doc. No. 209 – Bank of America, N.A.
Doc. No. 228 – GMAC-RFC Holding Company

support of dismissal, some of which apply only to certain defendants.[2] All Defendants, however, assert that the City's public nuisance claim fails because (a) it is preempted by Ohio law; (b) it is barred by the economic loss doctrine; (c) Plaintiff has not alleged interference with a public right; (d) Defendants' conduct did not constitute an unreasonable interference with a public right; and (e) the allegations in the SAC are insufficient to demonstrate proximate cause. The City filed a combined response in opposition to the motions to dismiss, and Defendants filed replies. In this memorandum, the Court addresses four of the aforementioned universally-applicable arguments raised by Defendants and, finding each of the four selected arguments independently sufficient to sustain the disposition of the case, declines to address Defendants' remaining contentions.[3]

## II. Law & Analysis

### A. Standard of Review

When reviewing a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations as true, and determine whether the moving party is entitled to judgment as a matter of law. *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 336 (6th Cir. 2007) (citing *United States v. Moriarty*, 8 F.3d 329, 332 (1993)). To survive a motion to dismiss under Rule 12(b)(6), the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Although this is a liberal pleading standard, it requires more than the bare assertion of legal conclusions. Rather, the complaint must contain either direct or inferential allegations respecting all the material elements

---

[2] For instance, the Wells Fargo defendants argue that the City's claim is preempted by the National Bank Act, 12 U.S.C. § 21, *et seq*. (*See* Doc. Nos. 202 & 203.) Several defendants joined in this argument (*see* Doc. Nos. 205, 207, and 209), but it applies only to those defendants that are federally-chartered national banks.

[3] The Office of the Comptroller of the Currency ("OCC") filed a motion for leave to appear as *amicus curiae* in support of the Wells Fargo defendants. (Doc. No. 224.) In its memorandum, the OCC supports the National Bank Act preemption arguments raised by the Wells Fargo defendants. Because the Court does not address the federal preemption arguments, the OCC's motion for leave is denied as moot.

to sustain a recovery under some viable legal theory." *First Am. Title Co. v. DeVaugh*, 480 F.3d 438, 444 (6th Cir. 2007) (quoting *Se. Tex. Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 671-72 (6th Cir. 2006)).

### B. Choice of Law

This case is before the Court on diversity jurisdiction, 28 U.S.C. § 1332, so the choice of law rules of the forum state apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 US. 487, 496 (1941); *Himmel v. Ford Motor Co.*, 342 F.3d 593, 598 (6th Cir. 2003). In cases involving alleged torts, the law of the place of injury is presumed to govern. *Morgan v. Biro Mfg. Co., Inc.*, 15 Ohio St. 3d 339, 341 (1984). Because Plaintiff seeks to recover for injuries that allegedly occurred in Cleveland, Ohio, Ohio law controls.

### C. State Law Preemption

Defendants argue that the City's complaint is preempted by Ohio state law, specifically, Ohio Revised Code § 1.63, which states:

> The state solely shall regulate the business of originating, granting, servicing, and collecting loans and other forms of credit in the state and the manner in which any such business is conducted, and this regulation shall be in lieu of all other regulation of such activities by any municipal corporation or other political subdivision. Any ordinance, resolution, regulation, or other action by a municipal corporation or political subdivision to regulate, directly or indirectly, the origination, granting, servicing, or collection of loans or other forms of credit constitutes a conflict with the Revised Code, including, but not limited to, Titles XI, XIII, XVII, and XLVII, and with the uniform operation throughout the state of lending and other credit provisions, and is preempted.

Ohio Rev. Code § 1.63(A) – (B). Defendants maintain that the City's lawsuit is an "action by a municipal corporation [. . .] to regulate, directly or indirectly, the origination, granting, servicing, or collecting of loans or other forms of credit," and thus conflicts with the Ohio Revised Code, resulting in its preemption. The City responds by arguing that its public nuisance action is not a

4

regulatory action, but simply an ordinary action to recover money or property, and therefore does not fall within the purview of § 1.63.[4] The Court agrees with Defendants.

The statute expressly covers "[a]ny ordinance, resolution, regulation, or *other action*," and thus preempts more than just traditional legislative and administrative efforts. Ohio Rev. Code § 1.63 (emphasis added). Without question, common law actions for damages represent an important manner of regulating conduct. *Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1008 (2008) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 521 (1992)) (a common law action "limited to damages [. . .] 'can be, indeed is designed to be, a potent method of governing conduct and controlling policy.'"); *San Diego Bldg. Trades Council, Millmen's Union, Local 2020 v. Garmon*, 359 U.S. 236, 247 (1959) ("regulation can be as effectively exerted through an award of damages as through some form of preventive relief.")[5]

> The United States Supreme Court has recognized that the judicial process can be viewed as the extension of a government's regulatory power. As the court explained, "[s]tate power may be exercised as much by a jury's application of a state rule of law in a civil suit," as by regulation or ordinance.

*City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882, 889 (E.D. Pa. 2000) (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 572 n.17 (1996) and citing *Geier v. Am. Honda Motor Co.*, 529 U.S. 1913 (2000); *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 495 (1987); *New York Times v. Sullivan*, 376 U.S. 254, 265 (1964)). The Ohio General Assembly broadly defined the scope of municipal action preempted by § 1.63 to include "other action," not just municipal legislation or regulation. Given the expansive wording of the statute and the powerful regulatory

---

[4] The City first argues that Ohio Rev. Code ¶ 1.63 does not preempt its claim because "[c]ourts may not presume that [a] statute was intended to abrogate the common law[,]" but instead, "[s]uch an intention must be expressly declared by the legislature or necessarily implied in the language of the statute." *LaCourse v. Fleitz*, 28 Ohio St. 3d 209, 212 (1986). This argument is specious. Section 1.63 is, without question, an express preemption provision. Applying it to the City's claim does not require any "presumption" regarding the statute's preemptive intent; it is plainly expressed in the text.

[5] Thus, contrary to the City's contention, it makes no difference that its suit only seeks to recover monetary damages.

potential of common law damage claims, the Court finds that § 1.63 includes common law public nuisance claims like the one asserted by the City. *See City of Philadelphia*, 126 F. Supp. 2d at 889-90 (state statute specifying that power to regulate firearms in Pennsylvania rested exclusively with state legislature preempted common law public nuisance action brought by city against gun industry); *see also Sturm, Ruger & Co. v. City of Atlanta*, 560 S.E.2d 525, 530 (Ga. Ct. App. 2002); *Penelas v. Arms Tech., Inc.*, 778 So.2d 1042, 1045 (Fla. Ct. App. 2001).

The City's citations to a definition contained in another (wholly irrelevant) section of the Ohio Revised Code (§ 4905.65), which by its own terms applies only to "local regulation," does not inform the Court's judgment, as that definition ignores the broad language employed in the statutory text and describes only a small subset of the types of conduct subject to § 1.63. Nor does the City's suggestion that its lawsuit does not qualify as regulation because it does not establish "a detailed, comprehensive, independent code of lender conduct" hold any merit. That the City attempts to paint with a broad brush, attacking all subprime lending within its borders, rather than challenging specific practices or transactions, does nothing to lessen the regulatory nature of its complaint. Regulation can be general or specific, and as Defendants correctly point out, a general enactment barring subprime lending would be no less regulatory than a detailed, comprehensive scheme. Under the circumstances presented, the Court finds that the City's public nuisance action is a regulatory action by a municipal corporation.

Having concluded that the City's complaint constitutes a form of municipal regulatory "action" within the meaning of § 1.63, little doubt remains that the SAC seeks to "regulate, directly or indirectly, the origination, granting, servicing, or collection of loans or other forms of credit[.]" Through its complaint, the City seeks a judicial determination that the alleged subprime mortgage lending and securitization that took place in Cleveland constitutes a

public nuisance under Ohio common law. (SAC ¶¶ 4, 8, 21.) Such a finding would label as illegal a broad array of lending practices, including much of the mortgage lending that prevailed in the Cleveland market, which is home to many low income borrowers who did not qualify for prime mortgages. As a result, the SAC represents, at the very least, an indirect attempt to regulate the origination and granting of mortgage loans. It is therefore preempted by Ohio Revised Code § 1.63.

The City cannot avoid preemption simply by claiming it is acting as a private litigant exercising its proprietary powers, rather than performing its governmental function. The statute at issue makes no distinction between actions that regulate in a "governmental" capacity versus a "proprietary" capacity. It simply applies to "action" that "regulate[s]" the specified activities. Ohio Rev. Code § 1.63. As other courts have recognized, "the judicial process can be viewed as the extension of a government's regulatory power." *City of Philadelphia*, 126 F. Supp. 2d at 889. A municipality like the City "may not do indirectly" through litigation "that which it cannot do directly" through legislation. *City of Atlanta*, 560 S.E.2d at 530. Section 1.63 bars the City's lawsuit, just as it would any attempt to legislate on these issues. The distinction the City seeks to draw between its governmental and proprietary functions is, as far as the statute is concerned, one without a difference.

Furthermore, even if the statute acknowledged such a distinction, the very nature of the City's claim – which seeks relief for an alleged *public* nuisance – betrays any contention that its lawsuit is aimed at vindicating the City's private interests rather than "protecting its citizens or pursuing some other civic agenda." (Pl.'s Opp'n to Defs.' Mot. to Dismiss[6] at 28.) Public nuisance is defined as "an unreasonable interference with a right common to the general public." *Brown v. Scioto County Bd. of Comm'rs*, 87 Ohio App. 3d 704, 712 (4th Dist. 1993)

---

[6] Hereinafter abbreviated as "Pl.'s Opp'n."

(citing Restatement (Second) of Torts § 821B(1) (1979)). Unless the City is pursuing this lawsuit to vindicate "a right common to the general public," i.e., unless it is acting on behalf of the public in a governmental capacity (and not in its own private interest), it necessarily has no claim at all. That this is, in fact, the City's true purpose is on display throughout both the SAC and the City's opposition brief. It seeks to recover damages in the form of municipal expenditures it claims were necessary due to the increased need for police and fire protection and demolition of the foreclosed and vacant homes. (SAC ¶ 64.) Obviously, the City incurred those expenses to protect the public from the hazards posed by the increasing stock of vacant homes, not for some private reason unrelated to the public interest. Similarly, in its opposition the City claims that it is exercising its powers of local self-government (rather than its police power), which it concedes includes "the functions of government [. . .] that [. . .] relate to the municipal affairs of the particular municipality." (Pl.'s Opp'n at 31) (quoting *Fitzgerald v. City of Cleveland*, 88 Ohio St. 338, 344 (1913)). Elsewhere in its opposition, moreover, (in arguing against application of the economic loss rule) the City contends that public nuisance law provides redress for impairment to a public right, which "either inflicts material 'annoyance, inconvenience, or injury' upon the public or creates 'an unreasonable risk of harm.'" (Pl.'s Opp'n at 34) (citations omitted). The City also contends that "[t]he foreclosures precipitated by the Defendants have markedly compromised the 'public health, safety, [and] peace' of life in Cleveland." (Pl.'s Opp'n at 15) (citation omitted).

By asserting a claim for public nuisance, the City by definition seeks to advance its governmental interest in protecting its citizens, rather than some purely private agenda (which

it could not, in any event, use a public nuisance claim to pursue).[7] The allegations levied in support of its claim, along with the arguments it raises in opposition to dismissal, confirm the purpose of the City's suit as a means of protecting the public interest.[8] As such it is a regulatory action by a municipal corporation that Ohio Revised Code § 1.63 preempts.

Finally, Defendants' state law preemption argument rests on express statutory grounds and does not implicate the Ohio Constitution. Thus, the City's insistence that its lawsuit does not violate the Home Rule Amendment is of no moment.

For the reasons explained *supra*, the City's public nuisance lawsuit falls within the ambit of the preemption provision of Ohio Revised Code § 1.63, and is therefore subject to dismissal. Even if not preempted by state law, however, the City's claim fails as a matter of law on several other grounds. The Court turns to the substance of the public nuisance claim to address these additional bases for dismissal.

### D. Public Nuisance

Ohio law defines nuisance as "a distinct civil wrong, consisting of anything wrongfully done or permitted which interferes with or annoys another in the enjoyment of his legal rights." *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 436 (1944). Nuisances fall into two broad categories, public and private. The City's claim alleges a public nuisance, which is "an unreasonable interference with a right common to the general public." *Brown*, 87 Ohio App. 3d at 712.

---

[7] The City's citation to *City of Vista v. Robert Thomas Secs., Inc.*, 84 Cal. App. 4th 882 (2000) is completely inapposite. In that case, the plaintiff municipality purchased securities directly from the defendant broker. The municipality did not assert a claim for public nuisance, but sought relief on a variety of theories that any private investor would have had standing to pursue. The case bears no factual or legal resemblance to the City's complaint.

[8] If that is not its purpose, and the City is not suing to redress an interference with a right common to the general public, then the SAC clearly fails to state a public nuisance claim as a matter of law. *See Brown*, 87 Ohio App. 3d at 712.

Public nuisance divides further into two subcategories – absolute nuisance and qualified nuisance. *Hurier v. Ohio Dep't of Transp.*, No. 01AP-1362, 2002 WL 2005755, at \*2 (Ohio App. 10th Dist. Sept. 3, 2002). Absolute nuisance involves conduct that is "inherently injurious," and is essentially a strict liability cause of action. *Brown*, 87 Ohio App. 3d at 713. In contrast, qualified nuisance imposes liability for otherwise lawful actions "so negligently or carelessly done as to create a potential and unreasonable risk of harm, which in due course results in injury to another." *Metzger v. Pa., Ohio, & Detroit R.R. Co.*, 146 Ohio St. 406 (1946) (citing *Taylor*, 143 Ohio St. at 427). "[A] civil action based upon the maintenance of a qualified nuisance is essentially an action in tort for the negligent maintenance of a condition, which, of itself, creates an unreasonable risk of harm, ultimately resulting in injury. The dangerous condition constitute[s] the nuisance. The action for damages is predicated upon carelessly or negligently allowing such condition to exist." *Rothfuss v. Hamilton Masonic Temple Co. of Hamilton*, 34 Ohio St. 2d 176, 180 (1973). Because it is premised upon negligence, a qualified nuisance claimant must plead and prove the traditional elements thereof: duty, breach, proximate causation, and damages. *Allen Freight Lines, Inc. v. Consol. Rail Corp.*, 64 Ohio St. 3d 274, 276 (1992); *Brown*, 87 Ohio App. 3d at 713.

Thus, to state a viable claim for qualified public nuisance, Plaintiff must allege facts sufficient to demonstrate that Defendants owed Plaintiff a duty, Defendants breached that duty, and Defendants' breach proximately caused Plaintiff's injury. *Rahman v. Ohio Dep't of Transp.*, No. 05AP-436, 2006 WL 1645021, at \*5 (Ohio App. 10th Dist. June 15, 2006). In a qualified nuisance action like this one, "[t]he allegations of nuisance and negligence [. . .] merge, as the nuisance claims rely upon a finding of negligence." *Allen Freight*, 64 Ohio St. 3d at 276. The presence of a duty equates with the existence of a right common to the general public, and

10

the element of breach is established by reference to an "unreasonable interference" with that public right. The plaintiff also must allege a "special injury," a "particular harm [. . .] that is of a different kind than that suffered by the public in general." *Brown*, 87 Ohio App. 3d at 714. The special injury "must be different in kind, rather than different in degree, from that suffered by other members of the public exercising the public right." *Kramer v. Angel's Path, L.L.C.*, 174 Ohio App. 3d 359, 367 (Ohio App. 6th Dist. 2007) (citing *Miller v. City of W. Carrollton*, 91 Ohio App. 3d 291, 295-96 (2d Dist. 1993)).

### 1. The Economic Loss Doctrine Bars The City's Claim

Defendants argue that the City's claim is completely barred by the economic loss doctrine which, as a general matter, precludes recovery in tort for purely economic losses not arising from tangible physical harm to persons or property. *See Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*, 73 Ohio St. 3d 609, 615 (1995) (citing *Floor Craft Floor Covering, Inc. v. Parma Cmty. Gen. Hosp. Ass'n*, 54 Ohio St. 3d 1, 3 (1990)); *Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 106 Ohio St. 3d 412, 414 (2005). The doctrine embodies the well-established principle "that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable." *Floor Craft*, 54 Ohio St. 3d at 3 (internal quotation marks and citations omitted); *see also Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins. Co.*, 42 Ohio St. 3d 40, 44 (1989).

Defendants argue that the economic loss rule applies in qualified public nuisance actions like this one, and bars the City from its desired recovery. In support of this argument, Defendants cite two cases: *Ashtabula River Corp. Group II v. Conrail Inc.*, 549 F. Supp. 2d 981, 987-88 (N.D. Ohio 2008) and *RWP, Inc. v. Fabrizi Trucking & Paving Co., Inc.*, No. 87382, 2006 WL 2777159, at *3 (Ohio App. 8th Dist. Sept. 28, 2006). The courts in both *Ashtabula*

11

*River* and *RWP* held that the economic loss doctrine applied to public nuisance actions brought under Ohio law, mandating dismissal of public nuisance claims seeking only economic damages.

Looking to avoid the fatal effect of the economic loss doctrine, the City makes several arguments, none of which has merit. First, the City baldly asserts that Ohio courts "do[] not enforce the economic loss rule in public nuisance cases." (Pl.'s Opp'n at 34-35.) This statement is at best misleading, as the City provides absolutely no direct support for it. The *Ashtabula River* and *RWP* decisions are the only Ohio cases discussing the application of the economic loss doctrine to public nuisance claims, and both concluded that the rule applies. Thus, the City's contention that Ohio courts do not apply the economic loss doctrine in public nuisance cases is palpably false, and its direct converse is true. The City's real argument is that both *Ashtabula River* and *RWP* were wrongly decided and can and should be ignored.

The City supports this position by (1) citing two law review articles suggesting that the economic loss doctrine should not apply in public nuisance actions; (2) arguing that the courts in *Ashtabula River* and *RWP* erred by failing to follow the Restatement (Second) of Torts on the issue; and (3) claiming that the Ohio Supreme Court implicitly acknowledged the inapplicability of the economic loss doctrine in *City of Cincinnati v. Beretta USA Corp.*, 95 Ohio St. 3d 416 (2002) (hereinafter, "*City of Cincinnati*"). These arguments are addressed *seriatim*.

Without citing any Ohio cases, the City instead refers to two law review articles, Denise E. Antolini, *Modernizing Public Nuisance: Solving the Paradox of the Special Injury Rule*, 28 Ecology L.Q. 755, 824 (2001), and David Kairys, *The Governmental Handgun Cases and the Elements and Underlying Policies of Public Nuisance Law*, 32 Conn. L. Rev. 1175, 1186 (2000), both of which suggest that public nuisance claims are excepted from the economic loss

rule.[9] As Defendants point out, these articles predate the *Ashtabula River* and *RWP* decisions and make no attempt to address the specifics of Ohio law. The articles therefore hold correspondingly little persuasive value in terms of describing Ohio law as it exists today. This is particularly so in light of the Ohio Supreme Court's recent reiteration of its commitment to the economic loss doctrine. In 2005, it observed that:

> The economic-loss rule generally prevents recovery in tort of damages for purely economic loss. The well-established general rule is that a plaintiff who has suffered only economic loss due to another's negligence has not been injured in a manner which is legally cognizable or compensable. This rule stems from the recognition of a balance between tort law, designed to redress losses suffered by breach of a duty imposed by law to protect societal interests, and contract law, which holds that parties to a commercial transaction should remain free to govern their own affairs. Tort law is not designed to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.

*Corporex*, 106 Ohio St. 3d at 414 (internal quotation marks and citations omitted).

     The City further contends that the courts in *Ashtabula River* and *RWP* erroneously failed to rely upon two illustrations set forth in a comment to the Restatement (Second) of Torts. *See* RESTATEMENT (SECOND) OF TORTS § 821C cmt. h (1979). This argument is without merit. The City's assertion that "Ohio courts rely heavily on [the Restatement] in delineating the contours of public nuisance law" is, at least with respect to the illustrations it cites, a serious

---

[9] The Kairys article devotes a single sentence to the economic loss issue, stating that the "economic loss doctrine [. . .] could not be applied to public nuisance claims without overruling at least two centuries of public nuisance law." Kairys, *supra*, at 1185. But while the author casts this statement of law in confident, seemingly incontrovertible language, it is supported with a single citation to a federal district court opinion, *In re One Meridian Plaza Fire Litig.*, 820 F. Supp. 1460, 1480 (E.D. Pa.), *rev'd on other grounds*, 12 F.3d 1270 (3d Cir. 1993). The court in *One Meridian Plaza* summarily concluded that "it is clear that the economic loss doctrine is not applicable to public nuisance claims [. . .]." 820 F. Supp. at 1480. However, at least one Pennsylvania court subsequently refused to follow the *One Meridian Plaza* decision on this very point and instead concluded that the Pennsylvania Supreme Court would adhere to "Pennsylvania's strong, oft-stated public policy of barring recovery for economic losses sustained as a result of another's tortious conduct [. . .]." *Duquesne Light Co. v. Pa. Am. Water Co.*, 850 A.2d 701, 704 (Pa. Super. 2004) (affirming summary judgment in favor of defendant in public nuisance action based upon economic loss doctrine). Like Pennsylvania, Ohio has a "strong, oft-stated" commitment to the economic loss doctrine.

exaggeration. A search of Ohio cases discloses exactly one published decision that makes any reference to Section 821C of the Restatement.[10] *See Brown*, 87 Ohio App. 3d at 714. That case refers directly to the text of the Restatement itself, and it does so in support of an uncontroversial proposition unrelated to the City's argument. *Id*. The City does not cite, and the Court is not aware of, any Ohio case relying upon any of the comments to Section 821C or upon any of the eleven illustrations contained therein. The City's suggestion that *Ashtabula River* and *RWP* were wrongly decided because those courts failed to defer to certain illustrations buried in the commentary section of a treatise is completely unfounded. Unlike the authors of the illustrations in the Restatement, the courts in *Ashtabula River* and *RWP* were bound to apply the law of Ohio as explained in the decisions of the State's highest court. In doing so, they concluded that the economic loss doctrine applies in public nuisance actions. The Restatement illustrations the City believes should trump those rulings run afoul of the economic loss doctrine and make no pretense of accounting for it. Thus, it certainly cannot be said that the courts in *Ashtabula River* and *RWP* erred by failing to heed the illustrations cited by the City; indeed, it would have been error to refuse to apply binding precedents on the basis of such authority.

Likewise, the Court is not persuaded by the City's argument that the Ohio Supreme Court's decision in *City of Cincinnati* supports a finding that the economic loss doctrine does not apply in public nuisance cases. The court in *City of Cincinnati* did not confront the economic loss doctrine in its discussion of the public nuisance claim. It simply was not addressed.[11] While the City suggests that this fact is sufficient to indicate that the Ohio Supreme

---

[10] There are two unpublished decisions as well, but they simply cite the published decision and note its reliance upon Section 821C. *See Hager v. Waste Techs. Indus.*, No. 2000-CO-45, 2002 WL 1483913, at *9 (Ohio App. 7th Dist. June 27, 2002); *Uland v. S.E. Johnson Cos.*, No. WM-97-005, 1998 WL 123086, at *5 (Ohio App. 6th Dist. Mar. 13, 1998).

[11] The City argues that because the court affirmed dismissal of Cincinnati's statutory product liability claims under the Ohio Products Liability Act ("OPLA") on grounds that the plaintiff failed to allege "harm" within the meaning of Ohio Rev. Code § 2307.79, the court implicitly held that the economic loss rule did not apply to the public

14

Court would not apply the economic loss doctrine if actually confronted with the issue, the Court disagrees. Viewed most charitably to the City's position, the Ohio Supreme Court's silence on the issue at best gives rise to a weak implication that it would not apply the economic loss doctrine in public nuisance actions. That implication might hold some persuasive value in the absence of any reliable indicators of how Ohio courts would decide this issue and if courts in other jurisdictions supported that view. But this is not an issue of first impression. Two previous Ohio cases (both decided after *City of Cincinnati*) placed the question of whether the economic loss doctrine applies in public nuisance cases squarely at issue, and both times, following thorough discussions of the applicable law, the courts answered in the affirmative. *Ashtabula River*, 549 F. Supp. 2d at 987-88; *RWP*, 2006 WL 2777159, at *4. Similarly, in Illinois, a jurisdiction which (like Ohio) abides by the economic loss rule, that state's highest court concluded that the rule barred recovery of purely economic damages in public nuisance actions. *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 420 (2004). To follow the City's invitation and reject these well-reasoned decisions on the basis of a heretofore unrecognized, purported *sub silentio* holding would be an exercise in judicial recklessness, if not pure folly.

    For these reasons, while the Court concurs with the City's assessment that *Ashtabula River* and *RWP* are not binding precedents, the Court finds the City's case for ignoring them completely unpersuasive. Accordingly, the Court rejects the City's suggestion that the

---

nuisance claim, or else it would have dismissed the claim on that basis. To recover under the OPLA, the plaintiff must allege "harm," which is defined as "death, physical injury to person, serious emotional distress, or physical damage to property other than the product in question. Economic loss is not 'harm.'" Ohio Rev. Code § 2307.71(G). This definition sounds a lot like the economic loss rule, but the fact that the court in *City of Cincinnati* affirmed dismissal of the statutory claims based upon the plaintiff's failure to satisfy the terms of the statute is not the same as saying it dismissed the claims based upon the economic loss rule. The OPLA is a statutory scheme enacted by the Ohio General Assembly which governs strict product liability claims in Ohio. *E.g., Botnick v. Zimmer, Inc.*, 484 F. Supp. 2d 715, 722 (N.D. Ohio 2007). By contrast, the economic loss doctrine is a creature of negligence law. The conclusion in *City of Cincinnati* that the plaintiff failed to allege "harm" within the meaning of the statutory definition provided by the OPLA does nothing to convince this Court that in doing so, without any discussion whatsoever, the Ohio Supreme Court also intended to implicitly repudiate the economic loss doctrine in qualified public nuisance cases dependent upon a finding of negligence, especially in light of the Ohio Supreme Court's more recent decision in *Corporex*.

cases were wrongly decided and do not accurately set forth the law of Ohio, but instead finds *Ashtabula River* and *RWP* compelling and agrees with Defendants that the economic loss doctrine prevents recovery of purely economic losses in a public nuisance action.

Finally, the City suggests that even if the economic loss rule applies to public nuisance suits, its complaint does not contravene the rule because the damages it seeks to recover are not exclusively economic, but are (at least partially) related to property damage. Specifically, the City alleges that Defendants' conduct caused physical degradation of the foreclosed homes, turning them into "eyesores," and "fire hazards," leading the City to incur "maintenance and demolition costs, together with increased fire and safety expenditures, while losing tax revenues on account of the diminished value of both the foreclosed residences and its [sic] neighbors." (Pl.'s Opp'n, at 38.)

In the SAC, the City asserts two general categories of damages, one consisting of the diminished property tax receipts owing to the foreclosure crisis, the other its costs in maintaining and demolishing the blighted post-foreclosure properties. As to the former category, there can be little dispute that these damages are purely economic in nature. *See Pavlovich v. Nat'l City Bank*, 435 F.3d 560, 569 (6th Cir. 2006) (citing *Chemtrol*, 537 N.E.2d at 629) ("Economic losses include [. . .] diminution in value and consequential losses like lost profits"). With respect to the latter category, while the physical deterioration of foreclosed homes may represent an injury to property sufficient in the abstract to avoid the economic loss rule, the affected properties did not belong to the City when the physical damage allegedly took place. Instead, the City seeks to recover for alleged physical damage to properties it did not own, but that were owned by someone else – i.e., the homeowners that went through foreclosure. The City provides no support for this position, and none exists.

As explained previously, the economic loss rule precludes tort recovery for economic losses not arising from tangible physical harm to persons or property. *Corporex*, 106 Ohio St. 3d at 414; *Floor Craft*, 54 Ohio St. 3d at 3. Thus, it does not bar a plaintiff from recovering economic damages that occurred as a result of damage *to the plaintiff's property*, *see Queen City Terminals*, 73 Ohio St. 3d at 615, but it cannot be avoided by claiming that physical damage occurred to the property of someone else. The court in *RWP* confronted and rejected the very same argument the City advances here. In that case, the plaintiffs subscribed to telecommunications services provided by SBC Ameritech. *RWP*, 2007 WL 2777159, at *1. The defendant cut the cables owned by SBC Ameritech, causing a service outage lasting several days that affected thousands of SBC Ameritech's customers, including the plaintiffs. *Id.* The plaintiffs sued the defendant on a public nuisance theory, the trial court granted summary judgment in favor of the defendant based upon the economic loss rule, and the Eighth District Court of Appeals affirmed. On appeal, the plaintiffs argued that the economic loss rule did not apply because, *inter alia*, they had sustained tangible property damage. *Id.* at *2. The court rejected this argument, concluding that the plaintiffs "ha[d] no property interest in the cables that were cut [. . .]" and "therefore failed to establish that they suffered harm to their persons or their property as a result of the outages." *Id.* at *4. Here, the City does not contend that it had any recognizable property interest in the (unidentified) properties that were allegedly damaged when they went through foreclosure. The City has thus failed to allege any injury to persons or property in which it had an interest, and the damages it seeks to recover are purely economic. As a consequence, its claim is barred by the economic loss doctrine.

**2. The City's Allegations Do Not Establish Unreasonable Interference With A Public Right**

Notoriously vague and ill-defined, public nuisance claims have been used to impose liability for a broad panoply of conduct. *See* RESTATEMENT (SECOND) OF TORTS § 821B cmt. a (1979) (examples include double parking; hitting golf balls into highways; keeping diseased animals; practicing medicine without a license; handling a snake at a religious ceremony; conducting a bullfight; using fireworks in the street; operating a noisy, rowdy dance hall; and playing baseball on Sundays). The nebulous and malleable nature of the claim notwithstanding, Ohio courts have long imposed the following concrete limitation on public nuisance claims: "What the law sanctions cannot be held to be a public nuisance." *Allen Freight*, 64 Ohio St. 3d at 277 (quoting *City of Mingo Junction v. Sheline*, 130 Ohio St. 34 (1935) and citing *Toledo Disposal Co. v. State*, 89 Ohio St. 230 (1914), *Francis v. Barberton*, 28 Ohio Law Abs. 359 (Ohio App. 9th Dist. 1938)).

> This is but another way of saying that although it would be a nuisance at common law, conduct which is fully authorized by statute or administrative regulation is not an actionable tort. This is especially true where a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct exist.

*Brown*, 87 Ohio App. 3d at 713.

Here, Defendants claim that their conduct cannot constitute a public nuisance because the subprime lending that underlies the City's claim was permitted, and even encouraged, by government regulation. According to Defendants, if subprime lending was sanctioned by law – and the City does not contend otherwise – then it cannot constitute a public nuisance under Ohio law. Therefore, the City's allegations against Defendants – accusing them of providing funding for subprime loans – cannot possibly be classified as a public nuisance.

18

The City responds by arguing that otherwise lawful conduct can still constitute a public nuisance if performed negligently. The City also contends that the regulations Defendants rely upon were inadequate and "reflect[] a total vacuum of effective oversight." (Pl.'s Opp'n at 19.) Furthermore, the City maintains, the regulations cited by Defendants pertain to lending, while the City challenges their mortgage securitization activities.

As to the first point of contention, this presents a purely legal question – does Ohio law allow otherwise legally-sanctioned conduct that is negligently performed to be classed as a public nuisance? The City says yes, Defendants say no. Defendants have the better argument. The City's position fails to frame the issue properly because it ignores the difference between conduct that is merely "lawful," as in "not legally prohibited," and conduct that is subject to regulation and, within the framework of a regulatory scheme, encouraged. Some illustrations are instructive.

It is, without question, perfectly lawful to own a trash receptacle and place it on one's property. As a general matter, no set of comprehensive state or federal statutes or regulations governs the placement of trash receptacles on property. Thus, such conduct is generally lawful, but not regulated. In a public nuisance action based upon such conduct, the plaintiff must plead and prove negligence. For instance, in *Williams v. 312 Walnut Ltd. P'Ship*, No. C-960368, 1996 WL 741982 (Ohio App. 1st Dist. Dec. 31, 1996), the plaintiff was walking on a skywalk when he encountered a trash receptacle and, instead of walking around it, attempted to vault over it, but failed and fell to the street below, sustaining severe injuries that ultimately led to his death. *Williams*, 1996 WL 741982, at *1. The plaintiff sued the owners of the property alleging, *inter alia*, that the trash receptacle "constituted a public nuisance which made the usual and ordinary course of travel on the skywalk unsafe [. . .]." *Id.* at *6. The court

evaluated the claim using traditional negligence principles, ultimately concluding that the property owners did not breach a duty to warn the plaintiff of an open and obvious danger relative to the trash receptacle. *Id*. But the fact that the law generally allows the ownership and use of trash receptacles did not immunize any of the defendants from liability.

The analysis differs where the conduct allegedly constituting a public nuisance is subject to regulation. Where a regulatory scheme governs the conduct of certain activity, courts assess whether the defendant complied with the regulatory scheme to determine whether a duty was breached, i.e., whether the defendant unreasonably interfered with a public right. Under such circumstances, if the defendant complies with that scheme, he cannot be sued for public nuisance by a plaintiff claiming that, despite compliance with the regulatory system, the activity was nevertheless performed in a negligent manner.[12] In *Hager*, for instance, the plaintiffs owned property adjacent to land on which the defendant built and operated a hazardous waste storage and treatment facility. 2002 WL 1483913, at *1. The plaintiffs sued the defendant alleging that the waste incinerator created a public nuisance due to the adverse effects it produced on the surrounding water, air, land, and the public's perception of the health and safety of the area. *Id*. The facility was regulated, and the defendant obtained all the necessary state and federal permits. *Id*. Citing evidence presented by the defendant that it was licensed to operate its hazardous waste incineration plant, the court held that "[s]ince [the defendant's] waste incineration facility operate[d] under sanction of law, based on that fact alone, it cannot be a common law public nuisance." *Id*. at *9 (citing *Allen Freight*, 64 Ohio St. 3d at 277) (further citations omitted).

---

[12] But just because the actor failed to comply with the regulatory scheme does not mean he is liable per se, because violation of a statute imposed for public safety will not preclude assertion of defenses and excuses-or in other words, will not result in strict liability – unless the statute clearly contemplates such a result. *Sikora v. Wenzel*, 88 Ohio St. 3d 493, 496 (2000). Thus, limiting nuisance actions to situations where the defendant has complied with a regulatory scheme does not convert qualified public nuisance into absolute public nuisance.

Finding that the defendant's conduct complied with the applicable regulatory scheme, inquiry into the common law public nuisance claim was at its end.

Because Defendants claim immunity from a public nuisance action based upon compliance with an applicable regulatory structure, this case is akin to *Hager*, and Defendants' view of the law is the correct one. Under a long line of decisions, a showing that the challenged conduct is subject to regulation and was performed in conformance therewith insulates such conduct from suit as a public nuisance. *Allen Freight*, 64 Ohio St. 3d at 277; *Mingo Junction*, 130 Ohio St. at 34. This is so regardless of whether, despite compliance with the regulations, such conduct could otherwise be described as negligent.[13]

This distinction between conduct that is subject to regulation, and conduct that is merely lawful, also highlights a fundamental difference between the instant case and *City of Cincinnati*, on which the City relies heavily for support. In that case, the plaintiff alleged that the defendant gun manufacturers marketed, distributed, and sold firearms in a manner that facilitated widespread accessibility of weapons to prohibited users, including children and criminals. *City of Cincinnati*, 95 Ohio St. 3d at 416. The plaintiff claimed that this conduct created and sustained an illegal underground market for firearms in Cincinnati. *Id*. The gun manufacturers argued that the distribution of firearms was highly regulated and therefore, based upon longstanding precedent indicating that conduct the law sanctions cannot constitute a public nuisance, they could not be held liable. In rejecting this argument, the Ohio Supreme Court distinguished cases like *Mingo Junction*, concluding that "[e]ven though there exists a comprehensive regulatory

---

[13] Obviously, this conclusion is strictly limited to qualified public nuisance actions under Ohio common law. The Court has not considered, and expresses no opinion about, the effect compliance with a set of applicable regulations would have on any other type of claim. Moreover, as noted in *Crawford v. Nat'l Lead Co.*, 784 F. Supp. 439, 445 (S.D. Ohio 1989), "[a]lthough what is authorized by law cannot be a *public* nuisance, it may nevertheless be a *private* nuisance, and the legislative authorization does not affect any claim of a private citizen for damages for any special inconvenience and discomfort caused by the authorized act not experienced by the public at large" (internal quotation marks and citations omitted).

scheme involving the manufacturing, sales, and distribution of firearms [. . .], the law does not regulate the distribution practices alleged in the complaint." *Id.* at 420. Thus, it was the plaintiff's allegation of an unregulated, illegal firearms market that allowed the public nuisance claim to escape dismissal. The City's SAC offers no analog. There is no contention that subprime lending and mortgage securitization in Cleveland took place in an unregulated environment.

Thus, if the challenged conduct is subject to regulation and the defendant complied with the regulatory structure, that conduct is not actionable under Ohio law as a public nuisance. Defendants assert that subprime lending was so regulated, and the City does not challenge Defendants' compliance with those regulations. Accordingly, Defendants argue, they cannot be held liable for public nuisance. The Court agrees.

Mortgage lending in general is subject to a vast regulatory regime. At the federal level, mortgage lenders are subject to a wide variety of statutes, including the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601 *et seq.*, the Home Mortgage Disclosure Act, 12 U.S.C. § 2801 *et seq.*, the Alternative Mortgage Transaction Parity Act, 12 U.S.C. § 3801, *et seq.*, the Fair Housing Act, 42 U.S.C. § 3601 *et seq.*, and the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.* The State of Ohio also has numerous laws that apply to mortgage lending, including the Land Installment Contract Act, Ohio Rev. Code § 5313.01 *et seq.*, the Ohio Mortgage Loan Act, Ohio Rev. Code § 1321.51 *et seq.*, and the Ohio Homeowners Equity Protection Act, Ohio Rev. Code § 1349.25 *et seq.*

Of particular relevance to this proceeding, in addition to the statutes noted *supra*, the federal government has enacted numerous laws and issued significant regulatory guidance specifically aimed at encouraging lending to traditionally underserved segments of the

population. For instance, Congress enacted the Community Reinvestment Act of 1977, 12 U.S.C. § 2901 *et seq.*, which requires federal agencies "to assess an institution's record of meeting the credit needs of the entire community, including low and moderate income neighborhoods, [. . .] and simultaneously to encourage the institution to do so." *Nat'l State Bank, Elizabeth, N.J., v. Long*, 630 F.2d 981, 984 (3d Cir. 1980) (internal citations omitted).

In addition, Congress created the Federal Home Loan Mortgage Corporation ("Freddie Mac") in 1970, and later wrote its purposes into law as part of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"). 12 U.S.C. § 1451 *et seq*. FIRREA was later amended by the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, and those amendments expressed that "[t]he congressional purposes for Freddie Mac are clearly designed to serve the public interest by increasing the availability of mortgages on housing for low- and moderate-income families and by promoting nationwide access to mortgages." *Am. Bankers Mortgage Corp. v. Fed. Home Loan Mortgage Corp.*, 75 F.3d 1401, 1406-07 (9th Cir. 1996). A related goal of the federal legislation creating institutions like Freddie Mac was to "enhanc[e] the availability of capital to lenders through a more sophisticated secondary mortgage market relying in principal part on *mortgage-backed securities* to bridge the gap between the investment community and the residential mortgage market." *Anchor Sav. Bank, FSB v. United States*, 81 Fed. Cl. 1, 16 (2008). Government-sponsored entities ("GSEs") like Freddie Mac "were established to improve the affordability of homes and home finance to lower- and middle-income Americans." *Id*. at 17.

To achieve these objectives, the Department of Housing and Urban Development repeatedly urged the GSEs to increase their role in furthering subprime lending. In 2000, HUD declared that "[a]n expanded GSE presence in the subprime market could be of significant

benefit to lower-income families, minorities, and families living in underserved areas." HUD's Regulation of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), 65 Fed. Reg. 65044, 65106 (Oct. 31, 2000). In a later statement, HUD expressed its view that this expansion in subprime lending was working to achieve the desired objective:

> The growth in subprime lending over the last several years has benefited credit-impaired borrowers—those who may have blemishes in their credit records, insufficient credit history, or non-traditional credit sources. Subprime lenders have allowed these borrowers to access credit that they could not otherwise obtain in the prime credit market.

HUD's Housing Goals for the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) for the Years 2005-2008 and Amendments to HUD's Regulation of Fannie Mae and Freddie Mac, 69 Fed. Reg. 63580, 63647 (Nov. 2, 2004).

The picture that develops from an overview[14] of these laws and agency actions is not just one of significant regulation, but of express governmental encouragement of the type of lending that forms the basis for the City's claim. In light of the vast regulatory machinery described *supra*, the City does not and cannot dispute the fact that subprime mortgage lending, which is absolutely fundamental to the allegations in the SAC, is subject to significant regulation. As such, it is, under Ohio law, conduct "the law sanctions." *Mingo Junction*, 130 Ohio St. at 34. This compels the conclusion that the City's allegations cannot state a viable claim for public nuisance. *Id.*

---

[14] The foregoing is by no means intended to provide an exhaustive view of the applicable regulatory universe. For purposes of the issues before the Court, reference to the state and federal laws cited herein is, in the Court's view, more than sufficient to establish that subprime lending was and is subject to significant regulation. Further discussion of the regulatory framework would be superfluous.

The City tries to avoid this conclusion by insisting that the SAC attacks only the securitization activities of Defendants, while simultaneously disclaiming any challenge to the actual subprime lending that occurred in Cleveland. According to the City, securitization, unlike subprime lending, is not regulated, and therefore can constitute a public nuisance (and should be analyzed using general negligence principles). This argument defies logic and is not well-taken.

In the SAC, the City specifically alleges that subprime lending was inappropriate for Cleveland because its population was generally poor and underemployed, its economy was less than robust, and property values in the City were not rising as they were elsewhere. According to the City, these conditions "should have eliminated Cleveland as a market for widespread subprime lending." (Compl. ¶ 59.) Thus, its complaint is that subprime loans should never have been given to borrowers in the City because it was all too foreseeable that these borrowers would ultimately default and the properties would be foreclosed, leaving the City to deal with the fallout. In essence, the City claims that as a whole, its residents were improper candidates for receiving subprime loans because those loans were too risky, and accuses Defendants of ignoring those risks and encouraging subprime lending within the City anyway by creating MBS that included mortgages on Cleveland properties. But even crediting the City's allegation that securitization of subprime mortgages increased demand for such mortgages and created a "money seeking borrowers" phenomenon, the City does not contend (nor would it make any sense to contend) that the fact that subprime loans were packaged into securities and resold heightened the default risk of any particular underlying mortgage. The fundamental facts on which individual mortgage underwriting decisions were made and the factors affecting the borrower's actual ability to repay (the borrower's income, job stability, savings, etc.) did not vary based on the quantity of subprime loans that were issued. Thus, whether or not Defendants'

securitization activities were responsible for increasing the overall number of subprime loans, if the underlying lending activity was lawful, it is impossible to say that supporting that activity by supplying funds and creating MBS – at least one step removed from the actual lending – was itself unlawful. Stated the other way, the City's public nuisance theory cannot succeed against Defendants unless the subprime lending Defendants allegedly facilitated also constituted a public nuisance.

Yet the City does not claim that the underlying subprime mortgage lending was illegal, but instead concedes, as it must, that subprime lending was subject to extensive regulation. Nowhere in the SAC does the City allege that Defendants violated any of the myriad laws governing mortgage lending.[15] This is fatal to the City's claim. There is no question that the subprime lending that occurred in Cleveland was conduct which "the law sanctions," and as such, it cannot be a public nuisance. *Allen Freight*, 64 Ohio St. 3d at 277; *Mingo Junction*, 130 Ohio St. at 34. By extension, therefore, facilitating that lawful conduct by financing it cannot be a public nuisance either. Defendants provide a useful analogy by citing *Hager*. If it was not a nuisance to build and operate a waste incinerator because the construction and operations complied with applicable regulations, *Hager*, 2002 WL 1483913, at *11, then any banks that financed the project certainly would not be subject to suit on grounds that doing so created a public nuisance.

The City also argues that even if the general rule exempts regulated conduct from public nuisance actions, that rule should be disregarded in this case because the regulations were ineffective and failed to prevent the calamitous foreclosure situation that befell Cleveland. But as

---

[15] This is, of course, a general statement, but it must be so general precisely because the City is challenging securitization activity generally, not the legality of any specific MBS or of the loan given to any specific borrower. Without question, it is possible that certain individual lenders engaged in specific transactions that did not comply with applicable regulations, but that possibility is not presented by the SAC and has no impact on the issues before the Court.

the limiting principle in *Mingo Junction* recognizes, courts are not in the business of second-guessing the wisdom of legislative or regulatory decisions. Indeed, that is the very purpose of the rule – to keep courts out of the process where Congress or the General Assembly has already struck the regulatory balance. The City fails to provide any authority for the proposition that conduct that is subject to and complies with regulation can nevertheless be deemed a public nuisance based upon a judicial finding that the regulatory system was inadequate. Based upon long-established Ohio law, compliance with a regulatory scheme exempts the regulated conduct from constituting a public nuisance. This Court cannot and will not substitute its judgment for that of the regulators whose express responsibility it was to oversee mortgage lending, particularly where some of those same regulators were explicitly encouraging the very conduct of which the City complains. Thus, the City's claim fails as a matter of law.

### 3. The City's Allegations Are Not Sufficient To Demonstrate That Defendants' Conduct Proximately Caused Its Alleged Damages

Defendants argue that the SAC is defective because the City's allegations fail to satisfy the directness requirement set forth in *Holmes v. Secs. Investor Prot. Corp.,* 503 U.S. 258 (1992). The *Holmes* case discussed the principle of "remoteness," which is related to both the substantive tort element of proximate causation, as well as to the prudential standing requirement. As the Sixth Circuit explained, "[s]tanding poses a threshold question involving constitutional [and] prudential [. . .] limitations on who may sue, regardless of the merits of that person's claim." *Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 612 (6th Cir. 2004) (citing *Allen v. Wright*, 468 U.S. 737, 750-51 (1984)). The standing aspect of remoteness focuses on whether the harm alleged is wholly derivative of the harm suffered by a third party. Proximate causation, on the other hand, "poses a merits question involving common-law and prudential limitations on the consequences for which the law will hold a defendant accountable, regardless of the

27

plaintiff's standing to sue." *Trollinger*, 360 F.3d at 612 (citing *Holmes*, 503 U.S. at 268). Defendants' directness argument attacks the merits of the proximate causation theory set forth in the SAC, rather than the City's standing to bring suit. Defendants maintain that the City's allegations do not establish a direct relationship between its harm and Defendants' conduct, with too many independent events and potential intervening causes lying in between. This is properly viewed as a merits issue, not one of standing, as "[i]t would be odd to say that the plaintiff lacks standing because of an intervening cause or because the harm to the plaintiff was not reasonably foreseeable; the plaintiff may lose on the merits as a matter of law for lack of proximate cause, but the injured plaintiff would have the right to file a lawsuit." *Id.*

The City raises several arguments in opposition to Defendants' remoteness challenge. First, the City contends that *Holmes* is inapplicable since it involved RICO claims under federal statutory law, while this case arises under Ohio's common law of public nuisance. Defendants argue that *Holmes* applies to any case in which proximate cause is one of the substantive elements or, at the very least, was incorporated into Ohio public nuisance law in *City of Cincinnati*.

As the Sixth Circuit has explained, "[b]ecause the *Holmes* Court emphasized that the RICO statute incorporates general common law principles of proximate causation, remoteness principles are not limited to cases involving the RICO statute." *Perry v. Am. Tobacco Co., Inc.*, 324 F.3d 845, 850 (6th Cir. 2003) (internal citation omitted) (citing *Serv. Employees Int'l Union Health and Welfare Fund v. Philip Morris, Inc.*, 249 F.3d 1068, 1076 n.6 (D.C. Cir. 2001); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 934 (3d Cir. 1999); *United Food and Commercial Workers Union, Employers Health and Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 n.7 (11th Cir. 2000)). In *Perry*, the plaintiffs,

who were individual subscribers to Blue Cross/Blue Shield health insurance, sued various tobacco companies based upon allegations that they were forced to pay increased premiums due to the presence of smokers in the insurance pool. The plaintiffs brought claims under RICO, various Tennessee consumer protection statutes, and Tennessee state law claims for breach of special duty, conspiracy, negligence, fraudulent concealment, and unjust enrichment. *Id*. at 848. The district court dismissed all of the plaintiffs' claims pursuant to Rule 12(b)(6) based upon a failure to allege proximate causation due to remoteness. On appeal, the plaintiffs argued that the district court erred by failing to analyze each of the claims individually, arguing that the state law negligence claims were subject to a different, lower proximate cause standard than the RICO claims. Specifically, the plaintiffs asserted that proximate cause could be established simply by showing that the harm was foreseeable. The Sixth Circuit rejected these contentions and affirmed, reasoning, based upon *Holmes* and its progeny, that "[t]hough foreseeability is an element of the proximate cause analysis, it is distinct from the requirement of a direct injury." *Id*. at 850 (citing *Holmes*, 503 U.S. at 268-69; *Laborers Local 17 Health and Benefit Fund v. Philip Morris*, Inc., 191 F.3d 229, 235 (2d Cir. 1999); *Steamfitters Local Union No. 614 Health and Welfare Fund v. Philip Morris, Inc.*, No. W1999-01061-COA-R9-CV, 2000 WL 1390171, at *4 n.2 (Tenn. Ct. App. Sept. 26, 2000). Thus, the court in *Perry* held that *Holmes* applied to state law negligence claims for which proximate cause was a required element of proof.

Any further question as to applicability of *Holmes* to the instant case is answered by the Ohio Supreme Court's opinion in *City of Cincinnati*. There, the Ohio Supreme Court applied *Holmes* to the claims asserted by Cincinnati against the various gun manufacturers, which included a cause of action under Ohio's common law of public nuisance. *City of Cincinnati*, 95 Ohio St. 3d at 426-28. Given that the Ohio Supreme Court – the final authority on

issues of state substantive law – applied *Holmes* to public nuisance claims, and that, as in *Perry*, a negligence standard governs the City's claim, the Court concludes that *Holmes* controls the proximate cause analysis.

The City's next argument against *Holmes* is that issues of proximate cause cannot be resolved on the pleadings. This too is incorrect, as the United States Supreme Court has expressly approved of applying *Holmes* in resolving a motion to dismiss under Rule 12(b)(6). *Anza v. Ideal Steel Supply Co.*, 547 U.S. 451, 453 (2006); *see also Perry*, 324 F.3d at 851 (affirming Rule 12(b)(6) dismissal of complaint, including state law negligence claims, on remoteness grounds); *Ass'n of Wash. Public Hosp. Dists. v. Philip Morris, Inc.*, 241 F.3d 696, 707 (9th Cir. 2001) (common law public nuisance claims under state law properly dismissed on Rule 12(b)(6) motion for lack of proximate cause due to remoteness).

Finding *Holmes* applicable, the discussion turns to the substance of the *Holmes* analysis which, at its core, requires "some direct relationship between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268.

> In *Holmes*, the court explained why directness of relationship is a requirement of causation: (1) indirectness adds to the difficulty in determining which of the plaintiff's damages can be attributed to the defendant's misconduct, (2) recognizing the claims of the indirectly injured would complicate the apportionment of damages among plaintiffs to avoid multiple recoveries, and (3) these complications are unwarranted given the availability of other parties who are directly injured and who can remedy the harm without these associated problems.

*City of Cincinnati*, 95 Ohio St. 3d at 426 (citing *Holmes*, 503 U.S. at 269-70).

Application of *Holmes* dictates the conclusion that the City's claim fails to sufficiently allege proximate cause. The City's allegations fail to demonstrate any direct relationship between its alleged injury and Defendants' conduct. It would be tremendously difficult, if not completely impossible, to determine which of the City's damages are attributable

to Defendants' alleged misconduct and not to some absent party. In addition, even if Defendants' securitization activities were somehow unlawful, subprime borrowers and MBS investors stand in closer proximity to Defendants' conduct and have potential claims and remedies available to vindicate their legal rights. Thus, the remoteness concerns articulated in *Holmes* reveal a lack of proximate cause, which mandates dismissal. A factual comparison illustrates.

In *Holmes*, the plaintiff Securities Investor Protection Corporation ("SIPC") was a private non-profit corporation whose members included registered broker-dealers. 503 U.S. at 261. SIPC provided insurance to investors against losses that occurred when one of its members was unable to meet its obligations. When a broker-dealer went bankrupt, SIPC was required to reimburse the broker's clients for claims that remained unsatisfied by the broker's liquidated assets. *Id.* at 261-62. SIPC sued the defendant Holmes, alleging that his conduct in connection with a stock manipulation scheme leading to the bankruptcy of two brokers caused the brokers to be unable to meet their obligations to clients, which, in turn, required SIPC to step in and reimburse the customers. *Id.* at 262-63. SIPC brought its claims under RICO, and the Supreme Court held that its claims were too indirect to permit recovery because the losses were completely contingent upon the insolvency of the third-party brokers that had allegedly occurred as a result of the defendant's actions. *Id.* at 271.

Here, the City's losses are similarly contingent upon the insolvency (or inability or unwillingness to repay) of non-parties – namely, the subprime borrowers whose homes were foreclosed and became fire hazards, eyesores, etc. Indeed, the City's alleged losses in this case are significantly more attenuated than those claimed by the SIPC in *Holmes*. In that case, the challenged conduct was only one step removed from the plaintiff's damages. While Holmes was at best indirectly responsible for SIPC's losses, he was the direct cause of the brokers'

insolvency, and the brokers' insolvency directly triggered SIPC's losses. By contrast, Defendants stand atop a lengthy chain of events, far removed from the City's ultimate damages. Defendants allegedly provided funding for MBS, which created significant demand for subprime loans. Mortgage brokers (encouraged by government regulators) went out and found willing borrowers, and with the assistance of lenders, provided mortgages to the subprime borrowers. Defendants then bought up great quantities of these loans, packaged them together in various ways, and quickly resold the MBS to investors. Many of the subprime borrowers later failed to repay their loans. This occurred for any number of reasons. For example, the borrower may have lost a job, kept a job but did not have the wherewithal to repay in the first place, suffered a catastrophic injury, borrowed too much on credit cards, been unable to refinance the original loan, taken out a second mortgage that the borrower was unable to afford, suffered investment losses that depleted savings that were to be used to repay the mortgage, or, despite an ability to pay, simply decided to walk away from the mortgage because the expense was not justified by the property's declining value – all of which the SAC conveniently ignores. Then someone – very importantly, not Defendants – foreclosed on the property. The property then failed to sell at the foreclosure auction and was taken back by the bank or abandoned. Regardless of who owned the property, it was not maintained – again, this could have occurred for any number of reasons. It eventually became an eyesore, a fire hazard, or otherwise deteriorated in condition to such a degree that the City was required to incur costs either maintaining the property or demolishing it. This confluence of events certainly was no small problem given the large volume of foreclosures in Cleveland and the city's budgetary constraints, but under no circumstances can it be described as having been directly caused by Defendants' conduct. As the foregoing discussion illustrates, the

potential number of intervening causes borders on incalculable. Accordingly, this case is factually indistinguishable from *Holmes*, directness is lacking, and the SAC must be dismissed.

  Examination of the administrative rationales for the directness requirement reinforces this conclusion. As the foregoing factual discussion highlights, Defendants' conduct was at most an indirect cause of the City's claimed damages. As such, the SAC forcefully implicates *Holmes*'s concern with the difficulty of "ascertain[ing] the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent factors[.]" The City even concedes the existence of several independent factors that could lead to foreclosures without regard to Defendants' conduct, including "the City's struggling, Rust-Belt economy, the fading prominence of the manufacturing sector, and Cleveland's challenges in attracting a meaningful replacement." (Compl. ¶ 55.) The City also acknowledges that the foreclosure crisis was precipitated by the broad decline in the housing market, which itself was the product of a myriad of factors occurring in unknown and unknowable proportions, many of which were completely beyond Defendants' control. Sorting out these contributing factors in an effort to assign liability would be a speculation-laden, uncertain endeavor of the exact kind the *Holmes* analysis was designed to avoid. *See Anza*, 547 U.S. at 459; *Laborers Local 17*, 191 F.3d at 239-40; *Canyon County v. Syngenta Seeds, Inc.*, 519 F.3d 969, 983 (9th Cir. 2008).

  The directness requirement also advances the notion that "directly injured victims can generally be counted on to vindicate the law as private attorneys general, without any of the problems attendant upon suits by plaintiffs injured more remotely[.]" *Holmes*, 503 U.S. at 269-70. In this case, individual subprime borrowers who lost their homes through foreclosure stand in closer proximity to Defendants' conduct, as do the investors who purchased MBS. As noted previously, mortgage lending is subject to a wide array of regulations. If Defendants participated

in any illegal conduct in connection with the underlying subprime lending, individual borrowers have a variety of remedies at their disposal. And unlike the City, MBS purchasers whose investments declined in value have direct relationships with Defendants, and have every reason to pursue any available legal remedies in the event Defendants' conduct failed to conform to the law. "The requirement of a direct causal connection is especially warranted where the immediate victims [. . .] can be expected to vindicate the laws by pursuing their own claims." *Anza*, 547 U.S. at 460. Where, as here, directly injured victims exist and have more "straightforward" legal remedies available to them, "[t]here is no need to broaden the universe of actionable harms to permit [. . .] suits by parties who have been injured only indirectly." *Id.*

In addition, the damages alleged by the City are, as in *Holmes*, purely contingent on harm first visited upon absent third-parties. 503 U.S. at 271. The City seeks to recover costs it incurred in "monitoring, maintaining, and demolishing foreclosed properties" and for "decreased tax revenues resulting from the depreciated value of the affected homes and all surrounding real estate." (Compl. ¶ 70.) Both of these damage categories depend for their existence upon intervening foreclosures suffered by third-party subprime borrowers, not the City. In the absence of the foreclosures (which Defendants did not even directly initiate), the City, by definition, would not have encountered the municipal expenditures it seeks to recover here. Likewise, its theory of lost property tax revenues also depends completely upon the foreclosures. While the foreclosure crisis ultimately wound up driving tax-paying property owners from their homes and depressed the values of neighboring properties, the reduction in value affected the property owners in the first instance, not the City. The City's claimed injury is therefore derivative and, as a consequence, fails as a matter of law for lack of proximate causation.

Finally, any contention by the City that the remoteness analysis in *City of Cincinnati* supports a finding of proximate cause is without merit. In *City of Cincinnati*, the Ohio Supreme Court espoused the *Holmes* analysis consistent with the original pronouncement by the United States Supreme Court, and this Court has applied it here without deviation from that formulation. In addition, as described in detail *supra*, the factual allegations in this case differ markedly and materially from those in *City of Cincinnati*, justifying a different result. As Defendants aptly note, the guns that comprised the illegal firearms market in *City of Cincinnati* originated with the defendant gun manufacturers, while in this case, Defendants did not originate the underlying subprime loans or initiate foreclosures in Cleveland, but merely provided funding for subprime lending. Thus, *City of Cincinnati* might be analogous only if the Ohio Supreme Court had concluded that the banks that provided financing to the gun industry could be held liable on a public nuisance theory. Its opinion does not so much as hint at such a broad expansion of public nuisance law.

This case also differs from *City of Cincinnati* because much of the harm alleged by Cincinnati occurred regardless of any injury to third-parties, while in this case, the City's damages are purely derivative. Cincinnati's damages were related to the existence of an illicit firearms market allegedly fostered by the gun manufacturers' conduct, and included "costs for law enforcement, increased security, prison expenses and youth intervention services." *City of Cincinnati*, 95 Ohio St. 3d at 427. Cincinnati had to bear such costs policing the existence of the market, irrespective of whether third-parties were actually injured by gun violence. As explained *supra*, this case is distinguishable because the City's claim hinges entirely on the foreclosure activity for which Defendants were at best indirectly responsible. The City does not and cannot claim that in the absence of any foreclosures, it was injured by the mere issuance of subprime

loans or MBS. Thus, *City of Cincinnati* is of no aid to the City's attempt to fulfill the directness requirement.

Finding the allegations in the SAC insufficient to establish proximate causation, the City's public nuisance claim fails as a matter of law.

### III. Conclusion

For the foregoing reasons, Defendants' motions to dismiss are **GRANTED**. The City's public nuisance claim fails as a matter of law because (1) it is preempted by Ohio Revised Code § 1.63; (2) it is barred by the economic loss rule; (3) the City's allegations fail to demonstrate an unreasonable interference with a public right; and (4) the City's allegations are insufficient to demonstrate that Defendants' conduct was the proximate cause of its alleged damages. Accordingly, the SAC is **DISMISSED** with prejudice.

**IT IS SO ORDERED**.


Dated: May 15, 2009

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**